228 F.3d 154 (2nd Cir. 2000)
 JOSEPH A. GANINO, ROBERT E. CREIGHTON, LOUISE A. CREIGHTON, WILLIAM J. FRAY, THE ESTATE OF NORMAN GARAND, THE GARAND FAMILY PARNTERSHIP, A. JOHN KALIL, REZA NAJAFZADEH, JEFFREY T. NORTON, REBECCA L. NORTON, JOHN NORTON, MATTHEW NORTON, LAURA NORTON, ALICE M. TOBIN AND BRANTLEY H. TUDOR, individually and on behalf of a class of persons similarly situated, Plaintiffs Appellants,
v.
CITIZENS UTILITIES COMPANY, LEONARD TOW, LIVINGSTON E. ROSS, AND ROBERT J. DESANTIS, Defendants Appellees.
 Docket No. 99-7904
August Term, 1999
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: April 10, 2000
Decided: September 06, 2000
As Amended Sept. 11, 2000
 
 Appellants appealed from a judgment of the United States District Court for the District of Connecticut (Warren W. Eginton, Senior Judge) dismissing the complaint for failure to state a claim.
 Reversed in part, vacated in part, and remanded. [Copyrighted Material Omitted][Copyrighted Material Omitted]
 ANDREW M. SCHATZ (Jeffrey S. Nobel, Andrew S. Turret, on the brief), Schatz & Nobel, PC, Connecticut, for Appellants.
 GEORGE A. ZIMMERMAN (W.H. Ramsay Lewis, Shoshanah V. Asnis, on the brief), Skadden, Arps, Slate, Meagher & Flom, LLP, New York, for Appellee.
 Before: NEWMAN, KEARSE, AND KATZMANN, Circuit Judges.
 KATZMANN, Circuit Judge:
 
 
 1
 The plaintiffs-appellants appeal from a final judgment of the United States District Court for the District of Connecticut (Warren W. Eginton, Senior Judge), granting the defendants-appellees' motion to dismiss the Second Amended Complaint (the "Complaint") for failure to state a claim under Sections 10(b)[1] and 20(a)[2] of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) & 78t(a), and Rule 10b-5[3] promulgated thereunder, 17 C.F.R. § 240.10b-5. The district court held: (1) the misrepresentations regarding certain payments amounting to 1.7% of total annual revenue were immaterial as a matter of law; (2) the lack of share price movement following the release of corrective information was evidence of immateriality; and (3) the Complaint was defective as to one or more of the other elements of a Rule 10b-5 suit. For the reasons that follow, we reverse in part, vacate in part, and remand with instructions.
 
 I. BACKGROUND
 A. Factual Background
 
 2
 The plaintiffs in this action purchased or acquired the common stock of Citizens Utilities Company ("Citizens" or the "Company"), the corporate defendant, between May 7, 1996 and August 7, 1997 (the "Class Period"). [JA 260 ¶ 1] Alleging that Citizens' share price was fraudulently inflated during the Class Period, the plaintiffs seek to represent the class of all purchasers of Citizens common stock during the Class Period in this action against Citizens and three of its senior officers. [JA 262-63 ¶¶ 8-9; JA 265 ¶ 11] The following allegations are drawn from their Complaint, which we accept as true for purposes of this appeal.
 
 
 3
 Citizens is a publicly traded communications and public services company. [JA 262 ¶ 8] As of 1995, Citizens had reported over fifty consecutive years of increased revenue, earnings, and earnings per share, a fact which it emphasized in its public comments. Id. [JA 269 ¶ 22; JA 280 ¶ 33] In 1995, however, Citizens would not receive approximately $38 million in revenue from Pacific Bell. [JA 296-97 ¶ 60d] In order to continue to report increased earnings, the Company had to find another source of revenue. [Id.]
 
 
 4
 That replacement source was Hungarian Telephone & Cable Corporation ("HTCC"), a U.S. company which provides telephone services in Hungary under telecommunications concessions from the Hungarian government. [JA 268-69 ¶ 20] The concession contracts require HTCC to meet certain construction milestones. [JA 268 ¶ 20b] Failure to do so would subject HTCC to fines, reduction of its exclusivity period, or abrogation of the contracts. [JA 269 ¶ 20c-d] Unprofitable since its inception, HTCC by 1995 lacked the necessary funds to satisfy its contractual requirements and began looking for a source of financing. [JA 269 ¶ 21] Beginning in May 1995, HTCC and Citizens (through a wholly owned subsidiary of Citizens) entered into a series of agreements under which Citizens agreed in 1995 to make and/or guarantee loans to HTCC. In consideration for these loans and guarantees, Citizens received substantial fees (the "Financial Support Fees" or the "Fees"), consisting primarily of HTCC stock and options. [JA 270-71 ¶ 23] In addition, Citizens also provided management consulting services to HTCC. Id. ¶ 23. [JA 272 ¶ 24c]
 
 
 5
 1. Allegations of Material Misrepresentations
 
 
 6
 Although Citizens earned and received approximately $10.1 million in Financial Support Fees from HTCC in 1995, Citizens, according to the Complaint, fraudulently recognized this sum as 1996 first and second quarter income without proper disclosure. [JA 281 ¶ 34(f), 284 ¶ 36(f)] Because Citizens' 1995 annual financial statement ("1995 Form 10-K") filed with the Securities and Exchange Commission (the "SEC") stated that Citizens "ha[d] been compensated for . . . guarantees and financial support [to HTCC]," investors were allegedly misled into believing that the $10.1 million booked in 1996 was new income, unrelated to the 1995 HTCC loan and guarantee transactions. [JA 276 ¶ 26, 283 ¶ 37] See 15 U.S.C. § 78m(a)(2) (requiring quarterly and annual financial reports to be filed with the SEC); 17 C.F.R. § 240.13a-13(a).
 
 
 7
 a. May 7, 1996 Announcement of 1996 First Quarter Financial Results and First Quarter Form 10-Q
 
 
 8
 On May 7, 1996, Citizens publicly announced an after-tax net income of $38.9 million for the first quarter of 1996, up 15% from the corresponding period in 1995. [JA 279-80 ¶ 33] These results were reflected in its 1996 first quarter financial statement ("First Quarter Form 10-Q"). [JA 117 (line item "Net Income"), JA 280 ¶ 33] The defendants did not disclose that "as much as $6.9 million of the $38.9 million . . . was HTCC related income which was deceptively 'stored' by Citizens" until the first quarter of 1996. [JA 281 ¶ 34f] According to the Complaint, the defendants also concealed the fact that this $6.9 million made up most if not all of the reported 15% increase during the first quarter of 1996. [Id.]
 
 
 9
 b. August 15, 1996 Press Release and 1996 Second Quarter Form 10-Q
 
 
 10
 On August 15, 1996, Citizens issued another press release announcing "record . . . profits for the three- and six-month periods ended June 30, 1996," with the second quarter's net income of $46.3 million representing a 10% increase over the comparable period in the preceding year. [JA 281 ¶ 35] Citizens attributed this growth to "continuous above-average growth in volume and profitability in each of its sectors, particularly telecommunications." [JA 281-82 ¶ 35] These results were reflected in its 1996 second quarter financial report ("Second Quarter Form 10-Q"). [JA 129 (line item "Net Income"), JA 282 ¶ 35] The Complaint charges that the August 15, 1996 press release and the 1996 Second Quarter Form 10-Q both failed to disclose that "approximately $10 million of the $85.1 million of reported income for the six months ended June 30, 1996 was HTCC related income" which should have been recognized in 1995. [JA 283 ¶ 36f] The Complaint states that the defendants also concealed the fact that this approximately $10 million accounted for the full 10% increase in income for the first six months of 1996 over the comparable period in 1995. [Id.]
 
 
 11
 c. Subsequent Financial Statements and Press Releases
 
 
 12
 The $10.1 million of Financial Support Fees were also reported as part of the year-to-date earnings in Citizens' 1996 Third Quarter Form 10-Q, 1996 Form 10-K, and accompanying press releases. [JA 284-86 ¶¶ 38-41] An additional $11.2 million of Fees were booked in the last quarter of 1996 and reflected in the 1996 year-end statement ("1996 Form 10-K"). [JA 287 ¶ 42f] In total, the Fees at issue added up to approximately $22 million, or 1.7% of Citizens' total revenue for 1996. [JA 146 (line item "Total revenues")] As with the Form 10-Qs for the first two quarters of 1996, the defendants did not disclose in the Third Quarter Form 10-Q, 1996 Form 10-K, and accompanying press releases that the reported income included HTCC Fees earned and received in 1995. [Id.]
 
 
 13
 On April 30, 1997, Citizens issued a press release announcing lower than expected earnings for the first quarter of 1997. These results were reflected in the Company's 1997 First Quarter Form 10-Q. [JA 287-88 ¶ 43; JA 288 ¶ 44] Neither document attributed the drop in income to the decrease in HTCC Fees. Instead, according to the Complaint, the press release misleadingly focused on rising expenses. [JA 288 ¶ 43] Beginning in or about May 1997, industry analysts began to report weaknesses in Citizens' earnings position. [JA 288-89 ¶¶ 46-47] Their predictions were confirmed by Citizens in August 1997 with the filing of its 1997 Second Quarter Form 10-Q, which also disclosed that the reported income for the first two quarters of 1996 included material income from HTCC. [JA 289 ¶ 48]
 
 
 14
 d. Other Misrepresentations
 
 
 15
 The defendants allegedly made other material misrepresentations. According to the Complaint, the defendants failed to disclose that the Fees were non-recurring income, in violation of a Generally Accepted Accounting Principle ("GAAP")[4] that companies report "extraordinary, unusual or infrequently occurring events and transactions." [JA 292 ¶ 53] See generally Accounting Principles Board ("APB") Opinion No. 30, ¶¶ 19-24 (1973) (explaining "Criteria for Extraordinary Items"). The defendants also allegedly concealed Citizens' control over HTCC and in fact, by employing "cost accounting," which under GAAP is appropriately used only to reflect a registrant's investment in a company the registrant does not dominate, Citizens falsely represented that it exercised no such control over HTCC. [JA 271-72 ¶ 24a; 277-79 ¶¶ 30-31] See generally APB Opinion No. 18, ¶¶ 5-17 (1971). According to the Complaint, Citizens' secret domination of HTCC was all the more significant because the Fees were paid in the form of HTCC stock and options, the price of which Citizens could manipulate using its influence over HTCC. [JA 290-91 ¶ 52]
 
 2. Scienter Allegations
 
 16
 The Complaint alleges that the defendants made the purported misrepresentations knowingly or recklessly. That is, defendants Leonard Tow and Robert DeSantis, senior officers of Citizens, believed throughout most of 1995 that a new source of income was needed to replace revenue from Pacific Bell that ceased in 1994. [JA 296 ¶ 60d] However, by the end of 1995, after the HTCC Fees were already paid in, Citizens found that it was able to meet earnings projections even without the Fees. [Id.] Not only were the HTCC Fees not needed in 1995 to replace lost revenue from Pacific Bell, but if Citizens had recognized the HTCC Fees in 1995, the Fees would have so increased Citizens' 1995 earnings that the Company would have difficulty meeting expectations for increased earnings in 1996. See id.. [JA 281 ¶ 34(f)] Thus, according to the Complaint, the defendants manipulated the recognition of the Fees in order to manage the income trend.
 
 
 17
 The defendants allegedly had other corporate and personal motives to maintain an artificial earnings growth trend, thus propping up Citizens' share price. In 1996, Citizens engaged in a stock-for-stock acquisition of another company and placed a debenture offering to finance its telecommunications expansion. [JA 297 ¶ 61(a)-(b)] Both of these transactions, the Complaint states, were well-served by an inflated stock price. As to the individual defendants, Livingston Ross (also a senior Citizens officer) and DeSantis purportedly engaged in insider trading during the Class Period, and all three individual defendants benefitted by securing their executive privileges. [Id. ¶ 61(c)-(d)]
 
 B. Procedural History
 
 18
 In 1988 the plaintiffs filed this action, asserting violations of § 10(b) of the Exchange Act and the corresponding Rule 10b-5 against all defendants, and violation of § 20(a) of the Exchange Act against the individual defendants as persons controlling Citizens. [JA 299-304 ¶¶ 62-76] The plaintiffs also sought to certify this action as a class action under Rule 23 of the Federal Rules of Civil Procedure. The defendants moved to dismiss the Complaint in its entirety, arguing that: (1) the nondisclosures at issue were immaterial because the information was already publicly available; (2) the plaintiffs failed to plead scienter with particularity; (3) the amount of Fees they allegedly "deceptively stored" was immaterial as a matter of law since it comprised a de minimis 1.7% of Citizens' total pre-tax revenues during the class period; (4) the plaintiffs' allegations of GAAP violations, without corresponding fraudulent intent, failed to state a claim; and (5) the Complaint failed to state a § 20(a) claim because the underlying § 10(b)/Rule 10b-5 charges are not viable. [JA 86-108]
 
 
 19
 The district court granted the defendants' motion to dismiss. See Ganino v.Citizens Utilities Co., 56 F. Supp. 2d 222 (D. Conn. 1999). Focusing on the issue of materiality, the court quoted a newspaper article which observed that "'[m]ost auditors -- and their corporate clients -- define materiality as any event or news that might affect a company's earnings, positively or negatively, by 3% to 10% . . . . [it] has become standard practice in corporate America. Thus, if a particular charge or event doesn't meet the 3% to 10% level, companies feel they don't have to disclose it.'" Id.at 226 (alteration in original) (quoting Elizabeth MacDonald, SEC Readies New Rules for Companies About What is "Material" for Disclosure, WALL ST. J., Nov. 3, 1998, at A2). [JA 225] Applying this 3% to 10% range, the court held that "the amount in issue here -- 1.7% of Citizens' revenues for the relevant time period, pursuant to GAAP -- is immaterial as a matter of law." Id. at 227. In addition, the court found that the lack of change in Citizens' stock price following the filing of the 1997 Second Quarter Form 10-Q on August 7, 1997, to be evidence of immateriality. See id.
 
 
 20
 Because the alleged misrepresentations were held to be legally immaterial, the court found it unnecessary to discuss the other grounds for dismissal urged by the defendants. It stated summarily that "[n]evertheless, the Court has thoroughly examined [the other] elements [of a Rule 10b-5 claim] and plaintiffs' supporting authority, and holds that such would not change the outcome of this case." Id. This appeal followed.
 
 II. DISCUSSION
 
 21
 We review de novo a district court's dismissal of a complaint pursuant to Rule 12(b)(6), accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiffs' favor. See Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000); Koppel v. 4987 Corp., 167 F.3d 125, 130 (2d Cir. 1999) (internal quotation omitted). We uphold a dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id.(internal quotation marks and citations omitted).
 
 A. The § 10(b)/Rule 10b-5 Claims
 1. Prima Facie Case
 
 22
 Section 10(b) of the Exchange Act bars conduct "involving manipulation or deception, manipulation being practices . . . that are intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive." Field v. Trump, 850 F.2d 938, 946-47 (2d Cir. 1988) (internal quotation marks and citation omitted); see Press v. Chemical Inv. Serv. Corp., 166 F.3d 529, 538 (2d Cir. 1999). To state a claim under § 10(b) and the corresponding Rule 10b-5, a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff. See In re Carter-Wallace, Inc. Sec. Litig., 150 F.3d 153, 155-56 (2d Cir. 1998); San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996); Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir. 1995).
 
 
 23
 The plaintiffs' principal contentions on appeal are that the district court erred in deciding that the Complaint failed to allege material misrepresentations and scienter. Neither they nor the defendants interpret the district court's dismissal of the Rule 10b-5 claims as having any other basis. Accordingly, we consider only the elements of materiality and scienter.
 
 2. Materiality
 
 24
 At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions. See Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988) (adopting the standard in TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976), for § 10(b) and Rule 10b-5 actions); Glazer v. Formica Corp., 964 F.2d 149, 154-55 (2d Cir. 1992). "'[T]here must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Basic, 485 U.S. at 231-32 (quoting TSC Indus., 426 U.S. at 449)). It is not sufficient to allege that the investor might have considered the misrepresentation or omission important. On the other hand, it is not necessary to assert that the investor would have acted differently if an accurate disclosure was made. Cf. Folger Adam Co. v. PMI Indus., Inc., 938 F.2d 1529, 1533-34 (2d Cir. 1991) (holding that jury charge which may have misled jury to believe that information is material only if it is outcome-determinative was error). An omitted fact may be immaterial if the information is trivial, see Basic, 485 U.S. at 231 (citation omitted), or is "so basic that any investor could be expected to know it," Levitin v. Painewebber, Inc., 159 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks omitted), cert. denied, 525 U.S. 1144 (1999). Therefore, whether an alleged misrepresentation or omission is material necessarily depends on all relevant circumstances of the particular case.
 
 
 25
 Materiality is a mixed question of law and fact. See TSC Indus., 426 U.S. at 450. We have held that, when presented with a Rule 12(b)(6) motion, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985); see Azrielli v. Cohen Law Offices, 21 F.3d 512, 518 (2d Cir. 1994).
 
 
 26
 a. Numerical Benchmark
 
 
 27
 The district court held that the alleged misrepresentations of the HTCC Fees as having been received in 1996 were immaterial as a matter of law because the Fees amounted to only 1.7% of Citizens' 1996 total revenue. The plaintiffs and the SEC, as amicus curiae, contend that the court's exclusive reliance on a single numerical or percentage benchmark to determine materiality was error. Their position is supported by ample authority. In Basic, the Supreme Court expressly rejected the use of a numerical formula:
 
 
 28
 A bright-line rule indeed is easier to follow than a standard that requires the exercise of judgment in the light of all the circumstances. But ease of application alone is not an excuse for ignoring the purposes of the Securities Acts and Congress' policy decisions. Any approach that designates a single fact or occurrence as always determinative of an inherently fact-specific finding such as materiality, must necessarily be overinclusive or underinclusive.
 
 
 29
 Basic, 485 U.S. at 236 & n.14 (1988) (citing House Committee on Interstate and Foreign Commerce, Report of the Advisory Committee on Corporate Disclosure to the Securities and Exchange Commission, 95th Cong., 1st Sess., at 327 (Comm. Print 1977)); see also FASB, Statement of Financial Accounting Concepts No. 2, ¶ 125 (1980) ("[M]agnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment.").
 
 
 30
 Following Basic, we have consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation. For example, in Press, we considered when failure to disclose the specifics of a securities markup[5] would be material. See Press, 166 F.3d at 534-37. Under § 10(b) of the Exchange Act, a seller has a duty to disclose the details of a markup if the markup is "excessive." See id. at 534. We declined in that case to establish a specific range beyond which a markup would be deemed "excessive," holding instead that courts must assess a broad range of factors. See id. at 535. In Glazer, we rejected the notion that merger talks are not material as a matter of law unless the discussions had ripened into an agreement-in-principle on price and structure. Glazer, 964 F.2d at 156. We held that the materiality of merger negotiations depends on the specific facts of each case. See id. See also In re Home Health Corp. of America, Inc. Sec. Litig., No. Civ. A. 98-834, 1999 WL 79057, at *6-7 (E.D. Pa. Jan. 29, 1999) (declining to hold immaterial as a matter of law failure to report loss of a de minimis percentage of total revenue where qualitative factor rendered the loss significant); In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 410 (S.D.N.Y. 1998) (relying on Basic and declining to hold as a matter of law that misstatements affecting profits by no more than 2.54% were immaterial).
 
 
 31
 With respect to financial statements, the SEC has commented that various "[q]ualitative factors may cause misstatements of quantitatively small amounts to be material." SEC Staff Accounting Bulletin ("SAB") No. 99, 64 Fed. Reg. 45150, 45152 (1999) (to be codified at 17 C.F.R. pt. 211, subpt. B) (representing interpretations and practices followed by the SEC's Division of Corporation Finance and the Office of the Chief Accountant in administering disclosure requirements of federal securities law).[6] Of particular relevance to this action are the following:
 
 
 32
 * whether the misstatement masks a change in earnings or other trends
 
 
 33
 * whether the misstatement hides a failure to meet analysts' consensus expectations for the enterprise[.]
 
 
 34
 Id. Unlike, for example, a rule promulgated by the SEC pursuant to its rulemaking authority, see15 U.S.C. § 78w(a), SAB No. 99 does not carry with it the force of law. See, e.g., Christensen v. Harris County, 120 S. Ct. 1655, 1662-63 (2000) (explaining that interpretations contained in opinion letters, like those in policy statements, agency manuals, and enforcement guidelines, which are not, for example, the result of a formal adjudication or notice-and-comment process, lack the force of law); General Elec. Co. v. Gilbert, 429 U.S. 125, 141 (1976) (stating that courts may give less weight to guidelines than to administrative regulations which Congress has declared shall have the force of law or to regulations which, under the enabling statute, may themselves supply the basis for imposition of liability) (superseded by statute on other grounds). Nonetheless, because SEC staff accounting bulletins "constitute a body of experience and informed judgment," Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), and SAB No. 99 is thoroughly reasoned and consistent with existing law -- its non-exhaustive list of factors is simply an application of the well-established Basic analysis to misrepresentations of financial results -- we find it persuasive guidance for evaluating the materiality of an alleged misrepresentation. See Christensen, 120 S. Ct. at 1663 (quoting Skidmore, 323 U.S. at 140); Gilbert, 429 U.S. at 125.
 
 
 35
 The two Court of Appeals cases cited by the district court support the approach we take here. In Parnes v. Gateway 2000, Inc., 122 F.3d 539 (8th Cir. 1997), the Eighth Circuit held that the alleged misrepresentations, which amounted to 2% of total assets, were immaterial as a matter of law "[t]aken in context." Id. at 547 (emphasis added). The court did not rely on the single numerical benchmark, but also took into consideration the fact that the case involved a high-risk/high-yield investment, and that the risk factors had been prominently disclosed in a prospectus. Id. at 542-43, 547. Similarly, in Glassman v. Computervision Corp., 90 F.3d 617 (1st Cir. 1996), the First Circuit Court of Appeals considered whether a 3% to 9% drop in quarterly revenue was immaterial as a matter of law. It stated, in dicta, that "[w]here a variable, although material, is of only minor predictive value, disclosure of a rough estimate of that variable's value can obviate the need for more specific disclosure." Id. at 633 (emphasis added). The clear implication of this statement is that a 3% to 9% drop may be material depending on the circumstances. To the extent that the two district court decisions also cited in the opinion below adopted a bright-line test for materiality, we disagree with their approach. See Shuster v. Symmetricon, Inc., No. 94-20024, 1997 WL 269490, at *8 (N.D. Cal. Feb. 25, 1997); Ferber v. Travelers Corp., 802 F. Supp. 698, 708 (D. Conn. 1992).
 
 
 36
 b. Relevant Line Item
 
 
 37
 The plaintiffs argue that the district court erred by comparing the Fees to Citizens' total revenue instead of total income. In so holding, the district court mistakenly believed that the plaintiffs' argument rested on an invalid accounting principle:
 
 
 38
 Although defendants assert that the amount of plaintiffs' alleged nondisclosure amounts to $6.9 million, or approximately 2% of Citizens' revenues, plaintiffs[] allege that this statement was inaccurate by 15.78% because Citizens used GAAP principles, rather than Equity Accounting.[7]
 
 
 39
 Ganino, 56 F. Supp. 2d at 224 (emphasis added). In fact, however, the plaintiffs' contentions with respect to the booking of the 1995 Fees as 1996 income depended not so much on the use of equity accounting as on the characterization of the Fees as income rather than revenue. Misstatements of income could be material because "earnings reports are among the pieces of data that investors find most relevant to their investment decisions." In re Burlington Coat Factory, 114 F.3d at 1420 n.9; see In re Kidder Peabody, 10 F. Supp. 2d at 410. The Complaint alleged that the Fees were "pre-tax income (revenue for which there was no corresponding expense)" [JA 279] and repeatedly compared the Fees to the "Net Income" line item on the Form 10-Qs. Whether the plaintiffs will be able to prove that the Fees had no offsetting expenses -- and therefore can be properly recorded as income -- is an issue of fact that cannot be decided at this stage of the litigation. On a motion to dismiss, the allegations in the Complaint must be accepted as true. Accordingly, the Fees should be treated as and compared to Citizens' pre-tax income.
 
 
 40
 The defendants do not dispute that the items in issue should be compared to like items on the corporate financial statement. On the contrary, they themselves point to numerous cases that did exactly that. See, e.g. Parnes, 122 F.3d at 545 (comparing reserves for dubious accounts receivable to total assets); In re Westinghouse Sec. Litig., 90 F.3d 696, 715 & n.15 (3d Cir. 1996) (comparing loss reserves, which for accounting purposes "most immediately" affects income, to total income for relevant period); Glassman, 90 F.3d at 633 (comparing dollar amount of backlog orders, a revenue item, to total revenues); Ferber, 802 F. Supp. at 707 (comparing real estate investments to total "invested assets"); In re First Chicago Corp. Sec. Litig., 769 F. Supp. 1444, 1454 (N.D. Ill. 1991) (comparing allegedly risky real estate loan to total real estate loan portfolio for year). Rather, the defendants challenge the assertion that the Fees went directly to Citizens' bottom line as income, a factual dispute that cannot be resolved without further development of the record.
 
 
 41
 c. Relevant Timeframe
 
 
 42
 We next consider the relevant timeframe. The plaintiffs, joined by the SEC, maintain that the court should have considered the impact of the alleged misrepresentations on all misstated items in the financial statement for all relevant periods, not only for the year as a whole. In this case, the Complaint alleged that substantial portions of the income reported during the first two quarters of 1996 were in fact the 1995 Fees. Accordingly, the plaintiffs and the SEC contend that the court should have assessed the impact of the Fees on Citizens' quarterly income. The defendants argue that the court correctly compared the Fees to annual results only, because the plaintiffs theorized that the defendants deferred recognition of the Fees in order to maintain Citizens' annual growth trend.
 
 
 43
 We reject the defendants' contention. Materiality is determined in light of the circumstances existing at the time the alleged misstatement occurred. See Pommer v. Medtest Corp., 961 F.2d 620, 625 (7th Cir. 1992); City Nat'l Bank of Fort Smith v. Vanderboom, 422 F.2d 221, 230 (8th Cir. 1970); Spielman v. General Host Corp., 402 F. Supp. 190, 194 (S.D.N.Y. 1975) ("The determination of materiality is to be made upon all the facts as of the time of the transaction and not upon a 20-20 hindsight view long after the event." (footnote omitted)), aff'd, 538 F.2d 39 (2d Cir. 1976). Thus, we held in Kaiser-Frazer Corp. v. Otis & Co., 195 F.2d 838, 843 (2d Cir. 1952), that an overstatement of fourth quarter earnings was not rendered immaterial simply because profits for the year as a whole were not affected by the misrepresentation because "the prospective purchaser was entitled to a full disclosure of all the facts that were known to the Corporation at the time the [financial statement] was issued." See also Glassman, 90 F.3d at 633 (comparing quarterly results); SEC v. Keller Indus., Inc., 342 F. Supp. 654, 657 n.5 (S.D.N.Y. 1972) (recognizing that a publicly filed interim quarterly report can be actionable under Rule 10b-5 if it contains material misstatements).
 
 
 44
 Citizens' own press releases implicitly acknowledge the significance of quarterly financial statements. For example, its May 7, 1996 press release touted first quarter results as a predictor of annual performance, stating that the Company was "well on its way toward its 52nd consecutive year of increased revenues, net income and earnings per share." [JA 280] See also 5B Arnold S. Jacobs, Litigation and Practice under Rule 10b-5 § 61.02[c], at 3-193 (West 1999) (noting that a company's decision to issue press release may show that company thought the data significant). Therefore, we think it appropriate to compare the Fees to not only annual, but also quarterly financial results.
 
 
 45
 d. This Complaint
 
 
 46
 Applying the foregoing principles to this action, we conclude that the Complaint alleged material misrepresentations in the 1996 First and Second Quarter Form 10-Qs and corresponding press releases, namely, the alleged misrepresentation of $10.1 million of Fees received in 1995 as 1996 income. The $6.9 million of 1995 Fees booked during the first quarter of 1996 equaled 17.7% of Citizens' reported after-tax net income ($38.9 million), and 11.7% of its pre-tax net income ($58.78 million) for that quarter. The $10.1 million reflected in the 1996 Second Quarter Form 10-Q amounted to 11.9% of after-tax net income ($85.15 million), and 8% of pre-tax net income ($126.62 million) for the first six months of 1996. We believe it is inappropriate to determine at this stage of the litigation that these substantial amounts, both in absolute terms and as percentages of total net income for the respective quarters, were immaterial as a matter of law.
 
 
 47
 Aside from the magnitude of the overstatements, the Complaint alleged that the defendants deceptively stored the Fees until 1996 in order to manage the Company's 1995 and 1996 income, and that they did so in order to conceal Citizens' failure to meet analysts' expectations and to sustain its 51-year earnings trend. The Complaint asserted that the $6.9 million of Fees reported in the First Quarter Form 10-Q accounted for "a substantial portion, if not all, of the increase in income for the first quarter 1996 compared to the first quarter of 1995[.]" [JA 281 ¶ 34f] Moreover, according to the Complaint, analysts' projections of Citizens' "income for the first six (6) months of 1996 were met and exceeded only as a result of th[e] additional HTCC-related income, and the increase in income for the first six months of 1996 compared to the first six months of 1995 was due entirely to the income recognized from HTCC." [JA 283 ¶ 36f] Viewed in this context, it cannot be said that no reasonable investor would have considered the misreporting of 1995 Fees as 1996 income to be significant or to have altered the total mix of information affecting their investment decisions. We therefore conclude that the Complaint alleged material misrepresentations. We need not and do not decide whether the purported misstatements regarding Citizens' control of HTCC and the non-recurring nature of the Fees are also material.
 
 
 48
 e. Market Response
 
 
 49
 The defendants urge us to affirm the district court's decision based on the lack of movement in Citizens' stock price after it filed its 1997 Second Quarter Form 10-Q on August 7, 1997, which the court held was "significant evidence" that none of the alleged misstatements of income were material to the investing public.[8] Ganino, 56 F. Supp. 2d at 227. [See also JA 163-65] According to the Complaint, on that date Citizens first publicly acknowledged that the reported income for the first and second quarters of 1996 included substantial payments from HTCC. The plaintiffs challenge this evidence, noting that Citizens' stock price did experience a "precipitous drop" in May 1997, when reports of Citizens' poor earnings outlook first emerged. [Blue 35]
 
 
 50
 The Complaint alleges only that earnings and earnings per share fell in May 1997, not price per share. However, drawing all reasonable inferences in favor of the non-moving party, as we must, we infer that Citizens' price per share dropped correspondingly in May 1997. In granting the defendants' motion to dismiss, the court did not draw this inference and did not appropriately resolve the disputed factual issue of whether the alleged misrepresentations adversely affected Citizens' share price during the Class Period. Cf. Silver v. H&R Block, Inc., 105 F.3d 394, 397 (8th Cir. 1997) (declining, on a summary judgment motion, to infer that allegedly material statements were false "from the movement of stock price alone . . . given the abundance of market variables"). We therefore vacate the district court's decision to the extent it held that the steadiness of Citizens' stock price after August 7, 1997 proved that the misreporting of 1995 Fees as 1996 income was immaterial.
 
 
 51
 f. "Truth on the Market" Doctrine
 
 
 52
 Because of the factual dispute over Citizens' share price, we also reject the defendants' attempt to rely on the so-called "truth on the market" corollary to "fraud on the market" as a basis for affirming the district court's decision. Under this corollary, a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market. See Provenz v. Miller, 102 F.3d 1478, 1492 (9th Cir. 1996); Associated Randall Bank v. Griffin, Kubik, Stephens & Thompson, Inc., 3 F.3d 208, 213-14 (7th Cir. 1993); cf. Rodman v. Grant Found., 608 F.2d 64, 70 (2d Cir. 1979) ("In determining whether [proxy statement] constituted full and adequate disclosure, the district court properly took into account information already in the public domain and facts known or reasonably available to the shareholders."). A defendant may rebut the presumption that its misrepresentations have affected the market price of its stock by showing that the truth of the matter was already known. See Provenz, 102 F.3d at 1492 & n.4; Associated Randall Bank, 3 F.3d at 213-14; cf. Basic, 485 U.S. at 248 (presumption of reliance in a fraud-on-the-market case may be rebutted by proving that "the 'market makers' were privy to the truth"). However, the corrective information must be conveyed to the public "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by" the alleged misstatements. In re Apple Computer Sec. Litig., 886 F.2d 1109, 1116 (9th Cir. 1989).
 
 
 53
 The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality. Cf. Provenz, 102 F.3d at 1493 (noting that summary judgment based on the "truth on the market" doctrine is appropriate only if defendants show that "no rational jury could find that the market was misled" (internal quotation marks omitted)). The two cases cited by the defendants do not hold otherwise, as both were decided at later stages of litigation after the parties had presented substantial evidence. See In re Convergent Tech. Sec. Litig., 721 F. Supp. 1133, 1138-39 (N.D. Cal. 1988) (deciding motion for summary judgment); Beissinger v. Rockwood Computer Corp., 529 F. Supp. 770, 781-82 (E.D. Pa. 1981) (deciding post-trial motion for involuntary dismissal).
 
 
 54
 Here, the defendants argue that the alleged inflation of 1996 income using the 1995 Fees was immaterial because Citizens' disclosures before Class Period had already transmitted all relevant information about the HTCC deal to the market. But as explained above, the evidence on which they rely -- the lack of movement in the Citizens share price after August 1997 -- is in dispute. Moreover, on the present record, it cannot be said that no reasonable investor could have been misled by Citizens' statement in its 1995 Form 10-Q that it "ha[d] been compensated" for its loans and guarantees to HTCC, into believing that Citizens' 1996 First and Second Quarter Form 10-Qs included no HTCC Fees.
 
 
 55
 The defendants also argue that HTCC's SEC filings during the Class Period contained sufficient accurate information to neutralize any misleading impressions created by Citizens' financial reports. They note that as early as April 1996, one month before the Class Period, HTCC had correctly disclosed when it paid the Fees to Citizens -- $6.9 million in options in 1995 and $3.2 million in stock in February 1996. [Red 9-10, 55] Their argument is untenable for two reasons. First, whatever dubious merit this argument may have, the defendants themselves have undermined it. They appear to have conceded, in the section of their brief discussing scienter, that the Fees were in fact recognized as 1996 income following a GAAP rule governing loan guarantee fees. SeeFASB, Emerging Issues Task Force Abstract No. 85-20 ("the guarantor should recognize fee income over the guarantee period"). [Red 21-23] Given that the Complaint alleges that at least a portion of the financial support that Citizens provided to HTCC took the form of direct loans, not loan guarantees, and that the Fees should have been reported as 1995 income, the plaintiffs have satisfied their burden of pleading a material misrepresentation. Second, even assuming that HTCC's disclosures were factually accurate, we cannot decide on the present record whether those disclosures were conveyed with sufficient "intensity and credibility" as to dispel the false impression created by Citizens' alleged misrepresentations. Therefore, we decline to affirm the district court's opinion based on the "truth on the market" doctrine.[9]
 
 B. Scienter
 
 56
 Next, the plaintiffs appeal to the extent the court ruled that they failed to plead scienter. Because we cannot discern from the opinion below whether the district court found the scienter allegations defective, we remand with the following comments on the proper pleading standard. See, e.g., Cosgrove v. Sears, Roebuck, & Co., 191 F.3d 98, 102 (2d Cir. 1999) (remanding for explanation of district court's basis for awarding costs); Etuk v. Slattery, 936 F.2d 1433, 1446-47 (2d Cir. 1991) (remanding for further consideration or clarification). The district court should review the Complaint to determine whether it meets our Circuit's pleading requirements for scienter as to each of the defendants.
 
 1. Pleading Requirements
 
 57
 It is well-settled in this Circuit that a complaint alleging securities fraud must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. See Chill v. General Elec. Co., 101 F.3d 263, 267 (2d Cir. 1996); Acito, 47 F.3d at 52; Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129-30 (2d Cir. 1994); Goldman, 754 F.2d at 1069-70. Rule 9(b) provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Chill, 101 F.3d at 267; Goldman, 754 F.2d at 1070. The requisite state of mind in a Rule 10b-5 action is "an intent to deceive, manipulate or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976). Such intent can be established "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields, 25 F.3d at 1128; see Acito, 47 F.3d at 52; In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268-69 (2d Cir. 1993). Although speculation and conclusory allegations will not suffice, neither do we require "great specificity" provided the plaintiff alleges enough facts to support "a strong inference of fraudulent intent." Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999); see Chill, 101 F.3d at 267 (internal quotation marks omitted); Acito, 47 F.3d at 53; Shields, 25 F.3d at 1128-29; In re Time Warner, 9 F.3d at 268; cf. Press, 166 F.3d at 538 (affirming denial of a motion to dismiss where plaintiff "barely alleged" scienter).
 
 
 58
 The defendants contend that the Private Securities Litigation Reform Act ("PSLRA"), P.L. 104-67, 109 Stat. 737 (1995), eliminated the option of pleading scienter by alleging that a defendant had motive and opportunity to commit fraud. [Red 19-20] We disagree.
 
 
 59
 The PSLRA tracks the first portion of our test requiring facts that support a strong inference of intent to promote a fraud:
 
 
 60
 In any private action arising under this title . . . the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.
 
 
 61
 15 U.S.C. § 78u-4(b)(2). However, the PSLRA did not expressly adopt our two distinct ways for pleading the requisite intent. On the contrary, the managers of H.R. 1058 (the PSLRA bill) stated that "[b]ecause the Conference Committee intends to strengthen existing pleading requirements, it does not intend to codify the Second Circuit's case law interpreting this pleading standard." H.R. Rep. No. 104-369, at 41 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 740. The legislative record, however, does not end there.
 
 
 62
 In part because of the quoted language in the Conference Report, the President vetoed H.R. 1058. See 141 CONG. REC. 38194 (1995).[10] During the subsequent Congressional debate to override the veto, major supporters of the bill, including its original sponsors, refuted the Conference Report, explaining that H.R. 1058 in fact codified the Second Circuit standard. See, e.g., 141 CONG. REC. 38323 (1995) (statement of Sen. Domenici) ("[I]t is the Second Circuit's pleading standard."); 141 CONG. REC. 38228 (1995) (statement of Sen. Dodd) ("We have met the second circuit's standard here"); 141 CONG. REC. 37802 (1995) (statement of Rep. Lofgren) ("The President says he supports the second circuit standard for pleading. . . . That is what is included in this bill."). Their understanding was later explicitly and prominently endorsed in the Joint Explanatory Statement of the Committee of Conference in connection with passage of the Securities Litigation Uniform Standards Act (the "Uniform Standards Act"), P.L. 105-353, 112 Stat. 3227 (1998):
 
 
 63
 [I]t was the intent of Congress, as was expressly stated during the legislative debate on the [PSLRA], and particularly during the debate on overriding the President's veto, that the [PSLRA] establish a heightened uniform Federal standard on pleading requirements based upon the pleading standard applied by the Second Circuit Court of Appeals.H. Rep. No. 105-803, at 15 (1998) (emphasis added) [not in USCCAN]. This legislative history leaves no doubt that the PSLRA "heightened the requirement for pleading scienter to the level used by the Second Circuit." Press, 166 F.3d at 537-38; see also Stevelman, 174 F.3d at 84.[11]
 
 2. This Complaint
 
 64
 Although the Complaint need only plead scienter by alleging either motive and opportunity, or conscious or reckless misbehavior, the plaintiffs contend that the Complaint does both. The Complaint alleges that the defendants consciously or recklessly failed to disclose the following material facts: (1) the Fees recognized in 1996 were earned and received in 1995; (2) a material portion of Citizens' 1996 first and second quarter income consisted of the non-recurring Fees; (3) Citizens and HTCC were related parties; (4) Citizens' 1996 income was inflated by unearned management fees; and (5) Citizens improperly used equity accounting with respect to its transactions with HTCC. On remand, the district court should consider whether any of these allegations, if true, would give rise to a strong inference of the defendants' intent to commit fraud.
 
 
 65
 As to motive and opportunity, opportunity is not disputed. However, the defendants challenge the sufficiency of the motive allegations. Motive "entail[s] concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." Shields, 25 F.3d at 1130. General allegations that the defendants acted in their economic self-interest are not enough. See, e.g., id. at 1130 (defendants' alleged motive of prolonging executive benefits does not support a strong inference of fraudulent intent); Chill, 101 F.3d at 268 (allegation that defendant desired to justify substantial investment by creating appearance of investment profit fails to plead scienter). The Complaint asserts that the defendants had three motives: to maintain its 51-year trend of increased earnings; to maintain an artificially high stock price to ensure a favorable stock-for-stock acquisition of another company; and to facilitate its debenture offering. In addition, the Complaint alleges that two of the three individual defendants engaged in insider trading during the Class Period and secured their executive benefits. Whether any of these allegations plead a cognizable motive under Rule 10b-5 should be determined by the district court in the first instance. Of course, if the court decides on remand that the Complaint successfully pleaded the defendants engaged in conscious or reckless misbehavior, it need not also consider the motive and opportunity prong of scienter.
 
 III. The § 20(a) Claim
 
 66
 To make out a prima facie case under § 20(a) of the Exchange Act, a plaintiff "must show a primary violation [here, the alleged Rule 10b-5 violations] by the controlled person [here, Citizens] and control of the primary violator by the targeted defendant [here, the individual defendants], and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996).
 
 
 67
 In this case, the district court dismissed the § 20(a) claim against the individual defendants upon ruling that the Complaint failed to plead the primary Rule 10b-5 violations. Because we remand the Rule 10b-5 claims, we also vacate the dismissal of the § 20(a) cause of action and remand to the district court for further consideration.
 
 CONCLUSION
 
 68
 For the reasons explained above, the judgment of the district court dismissing the Complaint for failure to state a claim is hereby vacated. We reverse the district court's holding with respect to materiality, and remand for further consideration of the scienter allegations and the § 20(a) claim.
 
 
 
 Notes:
 
 
 [1]
 Section 10 of the Exchange Act provides, in relevant part:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange
 . . .
 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 15 U.S.C. § 78j(b).
 
 
 [2]
 Section 20(a) of the Exchange Act provides, in relevant part:
 Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
 15 U.S.C. § 78t(a).
 
 
 [3]
 Rule 10b-5, entitled "Employment of manipulative or deceptive device," makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."
 17 C.F.R. § 240.10b-5.
 
 
 [4]
 Generally Accepted Accounting Principles ("GAAP") are the official standards adopted by the American Institute of Certified Public Accountants (the "AICPA"), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB"). See PNC Bancorp, Inc. v. Commissioner of Internal Revenue, 212 F.3d 822, 825 n.1 (3d Cir. 2000); Amerada Hess Pipeline Corp. v. Federal Energy Regulatory Comm'n, 117 F.3d 596, 601 (D.C. Cir. 1997); In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1421 n.10 (3d Cir 1997); Providence Hosp. of Toppenish v. Shalala, 52 F.3d 213, 219 n.7 (9th Cir. 1995). GAAP does not prescribe a fixed set of rules, but rather represent "the range of reasonable alternatives that management can use." In re Burlington Coat Factory, 114 F.3d at 1421 n.10 (citing Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 544 (1979)). The SEC treats the FASB's standards as authoritative. See PNC Bancorp, 212 F.3d at 825 n.1.
 
 
 [5]
 "A markup is the difference between the price charged to a customer for a security and the prevailing market price for the security." Press, 166 F.3d at 533 n.2.
 
 
 [6]
 The defendants argue that we should not apply SAB No. 99 to this case because it was promulgated after the events at issue here and "is not intended to change current law or guidance in the accounting or auditing literature." SAB No. 99, 64 Fed. Reg. 45150, 45152. However, the fact that SAB No. 99 did not alter the existing law or guidance is a reason to consider it in this case, not to refrain from doing so.
 
 
 [7]
 In a footnote, the court explained:
 Equity Accounting compares HTCC's gross pre-tax revenues to Citizens' net after-tax revenues. Each of the percentages set forth by plaintiffs use this accounting principle. The Court finds, however, that this approach is economically unsound and fails to take into account generally accepted accounting principles. As defendants have noted, such reasoning is to compare apples with oranges.
 Id. at n.1. We have a different understanding of the accounting concepts. Equity accounting is itself a GAAP principle and is a form of accounting that is most appropriately used "by an investor whose investment in voting stock gives it the ability to exercise significant influence over operating and financial policies of an investee." Accounting Principles Board Opinion No. 18, ¶ 18.17 (1972); see also Abraham J. Briloff, Unaccountable Accounting 48-49, 243 (1972) (discussing APB Opinion No. 18). Ownership "of 20% or more of the voting stock of an investee should lead to a presumption that in the absence of evidence to the contrary an investor has the ability to exercise significant influence over the investee." Id. In that circumstance, the investing company is required to report its percentage share of the investee's income or loss on its own financial statement. See generally id. ¶ 18.19. Equity accounting does not compare a company's gross pre-tax revenues to its net after-tax revenues.
 
 
 [8]
 The New York Stock Exchange data mentioned in the opinion below were not attached to the Complaint as an exhibit or incorporated by reference into the Complaint. Nevertheless, the district court may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment. See Fant v. Perelman, Nos. 97 Civ. 8435, 97 Civ. 8436, 1999 WL 199078, at *5 (S.D.N.Y. Apr. 9, 1999); Comas v. Merrill Lynch & Co., No. 92 Civ. 6560, 1993 WL 800778, at *4 n.2 (S.D.N.Y. July 2, 1993); cf. Cerasani v. Sony Corp., 991 F. Supp. 343, 354 n.3 (S.D.N.Y. 1998) (taking judicial notice of widespread press coverage of a criminal trial). Moreover, the movement of Citizens' stock price is integral to the plaintiffs' fraud-on-the-market theory. See Cortec Indus., Inc. v. Sum Holdings L.P., 949 F.2d 42, 47 (2d Cir. 1991).
 
 
 [9]
 Each of the parties have submitted and have asked that judicial notice be taken of various HTCC financial statements filed with the SEC. We need not decide the propriety of taking judicial notice of such materials because they would not affect the outcome of this case and, therefore, we do not rely on them.
 
 
 [10]
 The conferees' reading of the PSLRA also conflicted with the understanding held by some of the bill supporters at the time. See, e.g., 141 CONG. REC. 35238 (1995) (statement of Sen. D'Amato) ("The legislation creates a uniform standard for complaints that allege securities fraud. This standard is already the law in New York."); 141 CONG. REC. 35300 (1995) (statement of Sen. Grams) (expressing particular support for various provisions of H.R. 1058, including "[c]odification of the pleading standard adopted by the second circuit court of appeals").
 
 
 [11]
 The legislative record of the Uniform Standards Act also disclaimed footnote 23 of the Conference Report of the PSLRA, which rejected "in the pleading standard certain language relating to motive, opportunity, or recklessness" based on Second Circuit case law. H.R. Rep. No. 104-369, at 48 n.23, reprinted in 1995 U.S.C.C.A.N. 730, 747 n.23. That footnote was "inserted at the last minute [by a committee staffer] without [the committee's] knowledge." 141 CONG. REC. H10782 (daily ed. Oct. 13, 1998) (statement of Rep. Markey); see 141 CONG. REC. E2246 (daily ed. Oct. 20, 1998) (statement of Rep. Dingell).