### In re GLOBAL CROSSING, LTD. SECURITIES LITIGATION.

**Howard B. Thompson, et al., Plaintiffs,**

v.

**Li Ka–Shing, et al., Defendants.**

**No. 02 Civ. 8503(GEL).**

United States District Court,
S.D. New York.

March 24, 2003.

Michael G. Dowd, New York City, for plaintiffs.

David E. Kendall, Williams & Connolly LLP, Washington, D.C., for defendant.

*OPINION AND ORDER*

LYNCH, District Judge.

This action is one of nearly ninety filed against the officers and directors of Global Crossing, Ltd. ("GCL") and others by purchasers of GCL securities in the wake of the collapse, and accompanying decline in stock price, of the company in early 2002. Like many of the cases, this one has been transferred to this Court from the Central District of California by the Judicial Panel on Multidistrict Litigation for consolidated or coordinated proceedings. This action differs from all the others in that plaintiffs have added to the usual roster of defendants (the "private defendants") several "Corrupt Officials" (the "official defendants") who plaintiffs allege conspired with the private defendants to artificially inflate the price of GCL stock, and who plaintiffs claim are consequently liable as well for their losses. Among the official defendants named in the Complaint is William Jefferson Clinton, who was President of the United States during the events at issue in the complaint, and who now moves for dismissal of the complaint against him.

The complaint alleges that, "on a date currently unknown during his Presidency" (Compl. ¶ 53), Clinton joined an alleged conspiracy with the private defendants aimed at inflating the price of GCL stock. Specifically, it alleges that Clinton agreed to ignore certain fraudulent transactions and accounting practices of the private defendants, to ignore the "corruption of Pentagon officials" in awarding a certain defense contract to GCL that plaintiffs allege compromised national security, and to actually award that contract to GCL. (*Id.*) Clinton allegedly agreed to these acts and omissions in return for a "$1 million gratuity [in the form of] a $1 million 'donation' to his Presidential Library." *Id.* The complaint also alleges that all of the official defendants assisted the private defendants

in "unlawful, unfair, and fraudulent acts, practices, and concealment" by ignoring or delaying government action with respect to the private defendants' wrongful conduct, and by "opposing or defeating legislation and regulations" that allegedly would have put a stop to that conduct sooner. (Compl. ¶ 56.)

Plaintiffs seek compensation for losses they suffered from their own trading in Global Crossing stock during the relevant periods, as well as "over $75,000" each in punitive and exemplary damages. (Compl. ¶¶ 5–11.) They also seek unspecified injunctive relief against the official defendants "to prevent future injury," since "the Corrupt Officials still have the wealth, power, or influence with which to corrupt others and perpetuate the concealment of their involvement in the SCHEME." (Compl. ¶ 231.)

Clinton has moved to dismiss all claims against him on the ground that all the acts attributed to him were official acts for which civil liability is "barred by the absolute presidential immunity recognized by the Supreme Court in *Nixon v. Fitzgerald,* 457 U.S. 731, 749, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982)." Clinton is right, and his motion to dismiss will be granted.

## DISCUSSION

On a motion to dismiss under Fed. R.Civ.P. 12(b)(6), the Court must accept "as true the facts alleged in the complaint," *Jackson Nat'l Life Ins. Co. v. Merrill, Lynch & Co.,* 32 F.3d 697, 699–700 (2d Cir.1994). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (internal quotation marks and citations omitted). Here, plaintiffs are not entitled to offer such evidence, nor need this Court consider the plausibility of the claims or describe them in more detail

than it has already done. For, in *Nixon,* the Supreme Court held that the President is "entitled to absolute immunity from damages liability predicated on his official acts." 457 U.S. at 749, 102 S.Ct. 2690. This immunity is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers." *Id.* Clinton's alleged acts and omissions were, by the very terms of the complaint, official acts: His participation in the alleged conspiracy is said to have consisted of "official actions, favorable treatment, . . . favors by the federal government," and, along with the other official defendants, "ignoring [the] transactions described below, . . . opposing or defeating legislation and regulations . . . and . . . delaying civil, criminal, administrative, and Congressional inquiries, hearings, investigations, and enforcement actions. . . ." (Compl. ¶¶ 53, 56.) All of these alleged acts are official acts taken in pursuance of the powers and responsibilities of the President of the United States.

Plaintiffs argue that the complaint seeks not "to establish Clinton's liability on the basis of such official actions [but on the basis of] purely private, unofficial acts of joining private actors in a conspiracy to commit securities fraud and other wrongs. . . ." (P. Opp. at 9.) Specifically, they claim that "[i]t is not within the constitutional or statutory authority of the President to conspire with private actors to perpetrate securities fraud and other wrongs . . . in order to raise $1 million to finance his private library." (*Id.* at 11.)

This is sophistry. All lawsuits allege some form of unlawful or wrongful conduct, and of course nothing in the constitution or United States Code grants the President authority to engage in unlawful or wrongful acts. The "outer perimeter" of the President's "official responsibility,"

*Nixon*, 457 U.S. at 756, 102 S.Ct. 2690, would shrink to nothing if a plaintiff, merely by reciting that official acts were part of an unlawful conspiracy, could have them treated by the courts as "unofficial conduct." As the plaintiffs themselves point out, "[i]mmunities are grounded in 'the nature of the function performed,'" rather than in the lawful or unlawful motivations of the person performing them. (P. Opp. at 10, quoting *Clinton v. Jones*, 520 U.S. 681, 693, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997)). The functions that Clinton allegedly performed or failed to perform, which are alleged to constitute his role in the conspiracy and which made his alleged participation valuable to the alleged co-conspirators and harmful to plaintiffs, were at the core of his duties as President of the United States: enforcing federal laws against fraud, awarding government contracts, issuing regulations, and formulating his administration's legislative priorities and positions. These functions are protected from judicial "intrusion" in the form of private lawsuits for damages, *Nixon*, 457 U.S. at 754, 102 S.Ct. 2690, no matter the legal theory to which they are married in a complaint.

The Supreme Court and the Second Circuit have adopted precisely this analysis in the context of judicial and prosecutorial immunity. In *Dennis v. Sparks*, 449 U.S. 24, 26–27, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980), the Court held that where "[an] injunction had been corruptly issued as the result of a conspiracy between the judge and the other [private party] defendants ... the judge [was] properly dismissed from the suit on ... immunity grounds." That the injunction was allegedly issued for a corrupt and unlawful reason was not controlling; that issuing injunctions is a core judicial function was. As the Second Circuit has explained as to prosecutorial immunity: "The fact that [the alleged] conspiracy is ... not something ... properly within the role of [the official] is im-

material" where the action taken is within the core duties of the office. *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir.1994).

Plaintiffs next attempt to characterize Clinton's unofficial act of joining the conspiracy as the "ultimate act" upon which liability is predicated. They cite *Ashelman v. Pope*, 793 F.2d 1072, 1078 (9th Cir.1986), for the sensible proposition that "it is the nature of the 'ultimate acts,' not the motivations from which they are undertaken, that controls," and then dubiously claim that the references to official actions in their complaint merely "lend context to the overall scheme." (P. Opp. at 15.) But plaintiffs cannot trump logic, temporal reality, the ordinary English meaning of the word "ultimate," and the plain language of their own complaint by calling the agreed-to wrongful acts that supposedly accomplished the objects of the alleged conspiracy "context" and the act of agreeing the "ultimate" act.

The alleged conspiratorial agreement was not the ultimate act responsible for plaintiffs' losses, in either a temporal or causal sense. Plaintiffs complain of losses they suffered as a result of the inflation in the value of Global Crossing, Ltd., stock. The last or final act by Clinton that contributed to plaintiffs' losses, according to their own complaint, was his failure to use his office to prevent the misdeeds of the private defendants, not the necessarily earlier agreement to so act. And, timing aside, it is illogical to characterize the inchoate act of agreement as "ultimate" with respect to the agreed-upon course of conduct, when it is the nature of the conduct that makes the agreement itself objectionable, and which is alleged to have been responsible for the plaintiffs' injuries.

Nor can allegations of improper motivation – such as the alleged "bribe" of a $1 million donation to Clinton's presidential library – defeat the immunity. The Su-

preme Court in *Nixon* emphatically rejected any interpretation of presidential immunity that "would subject the President to trial on virtually every allegation that an action was ... taken for a forbidden purpose." 457 U.S. at 756, 102 S.Ct. 2690. Again, decisions regarding other immunities reach the same result. In *Schloss v. Bouse,* 876 F.2d 287, 290 (2d Cir.1989), the "claimed wrong" was a prosecutor's demand that the plaintiff execute releases in favor of certain policemen and municipalities in exchange for a decision not to prosecute. The Court of Appeals held that although the demand for a release could not in itself be considered a prosecutorial act protected by absolute immunity, it was not "sufficiently independent of the decision whether or not to prosecute to warrant characterizing the demand for releases as [non-prosecutorial acts]." *Id.* at 291. In the context of absolute (as opposed to qualified) immunity, the court held, "even conditional prosecutorial decisions" are protected from " 'any judicial scrutiny of the motive for and reasonableness of official action.' " *Id.* (quoting *Robison v. Via,* 821 F.2d 913, 918 (2d Cir.1987)). Plaintiffs' claims hinge upon Clinton's alleged agreement, in exchange for a donation to his Library, to take or neglect to take certain official actions. Therefore neither the acceptance of the donation nor the act of agreement were "sufficiently indepen-

dent" of official conduct to place them outside of the President's absolute immunity.

▮ Plaintiffs argue that even if their claims for damages must be dismissed, the doctrine of absolute presidential immunity does not extend to their claims for injunctive relief and associated legal fees.[1] The Court need not examine this proposition about immunity, since plaintiffs' claim for injunctive relief is moot. Global Crossing, Ltd., is bankrupt. (Compl. ¶ 2.) Its stock is presently valued at approximately $0.02 per share.[2] Clinton has not been President since January 2001 (Comp. ¶ 53), and he cannot be re-elected to that office, U.S. Const. amend. XXII § 1.[3] Therefore, there is no possibility that the conspiracy alleged here could be renewed or its harms re-enacted. *Associated General Contractors of Connecticut, Inc. v. City of New Haven,* 41 F.3d 62, 66–67 (2d Cir.1994). Therefore, plaintiffs' claims for injunctive relief against Clinton, and their request for legal fees in connection with that claim, must also be dismissed.

### CONCLUSION

For the reasons stated above, the motion of defendant William Jefferson Clin-

---

1. Plaintiffs argue that their claim for punitive damages is not barred by absolute presidential immunity because "punitive damages are 'quasi-criminal' in nature" and there is no presidential immunity for criminal actions. (P. Opp. at 22.) However, *Nixon* makes no exceptions for any particular kind of damages, and this Court sees no rationale for such an exception. On the contrary, the constitutional basis of the President's absolute immunity compels the conclusion that ·a litigant cannot defeat it simply by adding a claim for punitive damages to his complaint.

2. *http:// quote.money.cnn.com/quote/quote ?symbols=gblxq* (March 17, 2003). The

Court may take judicial notice of publicly-available stock quotations. *See Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 167 (2d Cir.2000).

3. Plaintiff's hypothesis that "Hillary Clinton ... has presidential aspirations which threaten to catapult [William Jefferson] Clinton back into the White House, whereupon he will be able to pick up where he left off" (P. Opp. at 20) is not only wildly speculative, but irrelevant to *this* alleged conspiracy, which, as pled, explicitly relies upon the use of presidential power, not the use of any power or "connections" belonging to a President's spouse.

ton to dismiss the complaint as against him is granted.

SO ORDERED.