SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

McGINN, SMITH & CO., INC.; McGinn, Smith Advisors, LLC; McGinn, Smith Capital Holdings Corp.; First Advisory Income Notes, LLC; First Excelsior Income Notes, LLC; First Independent Income Notes, LLC; Third Albany Income Notes, LLC; Timothy M. McGinn; and David L. Smith, Defendants.

Lynn A. Smith, Relief Defendant.

David M. Wojeski, Trustee of David L. and Lynn A. Smith Irrevocable Trust U/A 9/04/04., Intervenor.

No. 10–CV–457 (GLS/DRH).

United States District Court, N.D. New York.

July 7, 2010.

David Stoelting, Esq., Andrew Calamari, Esq., Michael Paley, Esq., Kevin McGrath, Esq., Lara Mehreban, Esq., Linda Arnold, Esq., of Counsel, New York, NY, for Plaintiff, Securities and Exchange Commission.

William J. Brown, Esq., Buffalo, NY, Receiver for Corporate Defendants, Phillips Lytle LLP.

Greenberg Traurig, Michael L. Koenig, Esq., of Counsel, Albany, NY, for Defendants Timothy M. McGinn and David L. Smith.

Featherstonhaugh, Wiley & Clyne, LLP, James D. Featherstonhaugh, Esq., of Counsel, Albany, NY, for Relief Defendant.

Jill A. Dunn, Esq., Albany, NY, for Intervenor.

## MEMORANDUM–DECISION AND ORDER

DAVID R. HOMER, United States Magistrate Judge.

Presently pending are the motions [1] of (1) plaintiff Securities and Exchange Com-

mission ("SEC") for a preliminary injunction freezing the assets of the defendants and of relief defendant[2] Lynn A. Smith ("Lynn Smith") and granting related relief pending a final disposition of the complaint herein (Dkt. No. 4, 5), and (2) intervenor David M. Wojeski, Trustee of David L. and Lynn A. Smith Irrevocable Trust U/A 9/04/04 ("Trust") lifting the temporary restraining order ("TRO") freezing the Trust and awarding costs and attorney's fees (Dkt. No. 31).[3] For the reasons which follow, both motions are granted in part and denied in part.

## I. Facts[4]

Defendants Timothy M. McGinn ("McGinn") and David L. Smith ("David Smith") joined to form McGinn, Smith & Co., Inc. ("MS & Co.") in 1981 with a principal place of business at 99 Pine Street, Albany, New York. Through its own employees and through related entities, MS & Co. offered financial services to clients, including investment advice and stock brokerage services as well as investments in securities which it sold. McGinn

presently serves as Chairman and Smith as President of MS & Co. Compl. (Dkt. No. 1) at ¶ 16, 17. Lynn Smith is married to David Smith. The Trust was created in 2004 for the benefit of the Smiths' two adult children. The SEC was created, *inter alia,* to regulate the purchases and sales of securities and acts to enforce compliance with laws and regulations governing such transactions. *See* 15 U.S.C. § 78a *et seq.*

## A. McGinn, David Smith, and the MS & Co. Entities

The SEC's complaint alleges that from September 2003 to October 2005, MS & Co. and its related entities raised over $120 million from over 900 investors solicited primarily by McGinn and David Smith. Compl. ¶ 1; Mehraban Decl. I (Dkt. No. 4–3) at ¶¶ 2, 3. The investments were made in four funds[5] which made over twenty unregistered debt offerings.[6] David Smith managed the funds and their investments while McGinn acted on behalf of MS & Co. and its related entities. Compl. ¶¶ 16, 17. Smith prepared and approved the Private Placement Memorandum (PPM) for each fund, which were

---

1. These matters were referred to the undersigned for decision pursuant to 28 U.S.C. § 636(c). Dkt. Nos. 12, 59.

2. A relief defendant, or nominal defendant, is not accused of wrongdoing but may be joined in an action to facilitate the recovery of relief. *Janvey v. Adams,* 588 F.3d 831, 834 (5th Cir. 2009) (citing *SEC v. Cavanagh,* 445 F.3d 105, 109 n. 7 (2d Cir.2006)).

3. The Trust was previously granted leave to intervene for this and related purposes. Dkt. No. 39.

4. The facts found herein are based on the sworn statements submitted by the parties, the exhibits attached thereto, the testimony of the witnesses at the hearing on June 9–11, 2010, and the exhibits received at that hearing.

5. First Advisory Income Notes, LLC; First Excelsior Income Notes, LLC; First Independent Income Notes, LLC; and Third Albany Income Notes, LLC (collectively the "Four Funds").

6. The debt offerings were described as

 various public and/or private investments, which may include, without limitation, debt securities, collateralized debt obligations, bonds, equity securities, trust preferreds, collateralized stock, convertible stock, bridge loans, leases, mortgages, equipment leases, securitized cash flow instruments, and any other investments that may add value to our portfolio (individually an "Investment" and collectively, the "Investments").
 PPMs of Four Funds (Dkt. Nos. 4–6 through 9) at 1.

essentially identical for all and which were given to investors. Mehraban Decl. I at ¶¶ 3–5. The SEC alleges that in a variety of ways, the defendants misrepresented to investors the true nature of the Four Funds, how the funds would be invested, the diligence with which the defendants had investigated the recipients of the funds' investments, the accreditation of investors, and had failed to register the Four Funds as securities as the law required. *Id.* at ¶¶ 6–13.

The SEC also alleges that the defendants raised additional capital through trust offerings. Beginning in November 2006, the defendants obtained from investors over $23 million for investment in over eighteen trusts. Mehraban Decl. I at ¶ 14. Potential investors were advised by defendants that the funds were created for specific purposes, such as the purchase of contracts for security alarm services, broadband cable services, telephone services, and luxury cruises. *Id.* at ¶ 15. Investors were to receive annual returns of 7.75–13% on their investments with the investment principle to be returned at the maturity date 18–60 months from the date of the offering. *Id.* at ¶ 17. From these trust funds, defendants charged fees under various rubrics totaling over 30% of the total invested in the funds, much of which was not disclosed to investors. *Id.* at ¶¶ 20–47. Given the high fees, both disclosed and undisclosed, charged to the funds by the defendants, the high rates of return promised investors were not reasonably possible.

In 2008, the defendants began advising investors that interest payments could not be made as promised, promised interest rates would be reduced and maturity dates extended, and defendant would no longer charge fees to the funds. Mehraban Decl. I at ¶¶ 54–56. In 2008, MS & Co. lost over $1.8 million. *Id.* at ¶ 57. Clients complained to authorities about how their investments were being handled and an investigation of the defendants was undertaken by the Financial Industry Regulatory Authority (FINRA).[7] Maya Decl. (Dkt. No. 4–3) at ¶ 3. As events unfolded in 2009, defendants evidenced increasing desperation to satisfy investors' complaints,[8] meet payroll, and continue their operations. *Id.* at ¶¶ 58–80. McGinn and David

---

7. FINRA was created by statute in 2007 as the only officially registered national securities association. *Nat'l Ass'n of Sec. Dealers, Inc. v. SEC*, 431 F.3d 803, 804 (D.C.Cir.2005). "By virtue of its statutory authority, [FINRA] wears two institutional hats: it serves as a professional association, promoting the interests of its] members ... and it serves as a quasi-governmental agency, with express statutory authority to adjudicate actions against members who are accused of illegal securities practices and to sanction members found to have violated the Exchange Act or [SEC] regulations issued pursuant thereto." *Id.* (citing 15 U.S.C. § 78o–3(b)(7)). In its self-regulatory rote, FINRA requires members to arbitrate disputes with clients, an arbitration may result in an award of damages to a client against a member, and FINRA may investigate the conduct of a member and impose sanctions. *See Karsner v. Lothian*, 532 F.3d 876, 880 (D.C.Cir.2008).

8. Clients began inquiring of their brokers at MS & Co. whether they had become victims of a *Ponzi* scheme. Mehraban Decl. I at ¶¶ 69, 73; *see also United States v. Treadwell*, 593 F.3d 990, 993 n. 2 (9th Cir.2010) ("The term Ponzi scheme refers to a fraudulent scheme in which, rather than paying investor returns from investment income, initial investors are paid off with new contributions from additional investors.... Although this may appear to be a good deal for participants at the outset, the underlying economics mean that such a scheme must eventually collapse, when the flow of new funds can no longer support payments required on the earlier funds invested. On collapse, the investors lose their remaining investments.") (citation omitted) (describing history of *Ponzi* schemes).

Smith also took certain steps to protect their own assets from the claims of investors, including transferring title to real estate held jointly with their wives into the names of the wives alone. T. 280–81, 301–02, 372.[9] Nevertheless, defendants continued to solicit and raise capital for the Four Funds through 2009 without advising potential investors of, for example, the reduced interest rates, extended maturity dates, and failures to pay earlier investors as represented. *Id.* at ¶¶ 81–85.

According to the SEC, as of the date of the commencement of this action, the defendants had raised over $120 million in investments in outstanding funds and over $80 million in principle is currently owed to investors. It appears that MS & Co. and its related entities possessed less than $1 million in assets for the benefit of investors as of that date. First Report of the Receiver (Dkt. No. 49) at 5.

## B. The Present Motion

On April 20, 2010, the SEC commenced this action by filing a complaint [10] alleging that the conduct described above constitutes past and ongoing violations of § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); Rule 10b–5 under the 1934 act, 17 C.F.R. § 240.10b–5; and related provisions. Compl. at ¶¶ 7–12. To preserve defendants' assets for the benefit of investors in the event it prevails here, the SEC simultaneously sought and received the TRO appointing a receiver to take possession of defendants' assets and of MS & Co. and its related entities, freezing defendants' assets pending the outcome of this action, freezing the assets of Lynn Smith, ordering verified accountings, and related relief. Dkt. Nos. 4, 5. A receiver was appointed and the assets of the defendants and Lynn Smith were frozen pending a hearing TRO at 7.

Prior to the commencement of the hearing on June 9, 2010, McGinn and David Smith consented to a preliminary injunction continuing the freeze of their assets. Dkt. No. 61. Through the receiver, the remaining defendants also consented to such an order. T. 40. Without objection, the SEC's motion for a preliminary injunction as to all defendants will be granted. Issues remain, however, as to both Lynn Smith and the Trust.

## C. Lynn Smith

Lynn Smith has been married to David Smith for forty-two years. Smith Aff. (Dkt. No. 23) at ¶ 2; T. 271, 357. Lynn Smith's father died shortly after her marriage leaving her, *inter alia,* a stock account then valued at approximately $60,000 ("Stock Account") and a camp on Great Sacandaga Lake.[11] Lynn Smith Aff. ¶¶ 13, 14; T. 326, 355–58. These inheri-

---

9. "T." followed by a number refers to the page of the transcript of the hearing on June 9–11, 2010.

10. On April 19 and 20, 2010, law enforcement authorities applied for and received eight search warrants in connection with a criminal investigation of the defendants. *See In re Search Warrants Issued Apr. 19 & 20, 2010,* No. 10–M–204 (N.D.N.Y. FILED May 12, 2010) at Dkt. No. 38, p. 1. The search warrants were executed in succeeding days. *Id.* at pp. 1–2. Criminal charges have not been filed, but the investigation remains ongoing,

*In re Search Warrants,* No. 10–M–204, at Dkt. No. 37.

11. Great Sacandaga Lake is located northwest of Albany and north of Amsterdam in the southern part of the Adirondack Mountains. In their August 2008 financial statement, the Smiths estimated the value of this property at $700,000 with no mortgage. Pl. Ex. 18 at 1. In her testimony here, Lynn Smith estimated its value at $600,000. Lynn Smith Aff. at ¶¶ 13, 14. No evidence has been presented that David Smith ever held an ownership interest in this camp.

tances have always been maintained solely in Lynn Smith's name. Lynn Smith Aff. ¶ 17; T. 355–59. In addition, in 2009, David Smith and Lynn Smith transferred title to a vacation property in Vero Beach, Florida ("Vero Beach home") into the name of Lynn Smith alone. T. 280–81, 372.[12] In 2009, Lynn Smith also opened a checking account solely in her name after the Smiths had maintained only a single joint checking account for the previous forty years. T. 281–83, 374, 403–04. Thereafter, funds from the joint checking account were transferred into her account along with other funds and it was used to pay the Smiths' joint obligations. T. 282–83; 374–75.

The Stock Account was managed for the first few years by the firm retained by Lynn Smith's father. Lynn Smith Aff. at ¶¶ 14, 15; T. 358–59. However, David Smith became a licensed broker in the mid–1970s and assumed management of the account. T. 360. Over the years, the Smiths used proceeds from the account,

*inter alia,* to purchase their jointly owned primary residences, pay the costs of college educations for their two children, purchase two jointly owned vacation homes in Vermont and later in Florida, and create a Trust in both their names. T. 279–81; 328–29; 350–51; 368–72; *see also* subsection 1(D) *infra.* Notwithstanding these expenditures, however, the value of the Stock Account grew from a low of $10,000 in the 1970s to a high of over $7 million in 2001. T. 326–27; 349; 363–64. As of January 2010, the account's value was approximately $2.1 million. T. 364; *see also* T. 349–50 (explaining that approximately $2 million remained in the account subsequent to the creation of the Trust).

Although title to the Stock Account always has remained in the name of Lynn Smith alone, David Smith enjoyed unfettered control over the account.[13] For at least the last ten years, David Smith engaged in Stock Account transactions using authorizations signed in blank by Lynn Smith,[14] or with her signature signed by

---

**12.** In the August 2008 financial statement, the Smiths valued the property at $2.4 million and stated that the amount of the outstanding mortgage was $902,786. Pl. Ex. 18 at 1.

**13.** Lynn Smith asserts that she always maintained sole control over the Stock Account and that David Smith acted only as her broker on the account T. 176–77, 363. She testified that she signed blank account authorizations, and approved David Smith signing her name to others, for her own convenience. T. 384–86. She also testified that she knew of and approved all Stock Account transactions and that, while she approved every transaction proposed by David Smith until 2009, when she rejected David Smith's request to loan over $300,000 to MS & Co. to help meet the company's obligations. T. 335–39, 386–87. However, Lynn Smith also testified that when she and David Smith transferred assets previously held jointly or solely in David Smith's name into Lynn Smith's name alone, and when she opened a checking account in her name alone for the first time in her marriage, she took these actions to clarify her

financial independence from her husband and not to shield their assets from recovery by investors in light of the FINRA proceedings. T. 375–76, 405. Given that the Smiths had maintained a joint checking account for the previous forty years of their marriage, the fact that real property purchased during their marriage had always been maintained jointly in both their names, the timing of these transfers of title to Lynn Smith as the threat of investors recovering from David Smith mounted, the unfailingly self-serving content of Lynn Smith's testimony, the improbability of that testimony in material respects, the absence of credible corroborating evidence, inconsistencies in her testimony, and the Court's observations of Lynn Smith as she testified, the Court finds incredible her testimony regarding the reasons for these transactions as well as verbal communications with David Smith. Her testimony on those subjects is rejected.

**14.** Lynn Smith would sign 10–15 forms in blank at a time and provide them to David Smith for his use in completing transactions

David Smith, and completed by David Smith or a subordinate at MS & Co. T. 175–84; 339–41.[15] Besides investments, David Smith used the Stock Account to make numerous short-term loans to MS & Co. related entities, all of which were repaid from MS & Co. related accounts. *See, e.g.*, T. 341 (bridge loan to TDM Benchmark for $100,000 on March 18, 2010), 433–34 (bridge loan to McGinn Smith Funding for $375,000 on November 29, 2007), 437 (bridge loan to TDMM Cable Funding for $366,000 on June 5, 2009); *see also* Pl. Ex. 72, Ex. 2 (summary of deposits and withdrawals from Stock Account). David Smith also made two loans to McGinn totaling over $900,000 of which over $700,000 remains unpaid. T. 124–25, 278–79. In 2009, David Smith also caused assets held solely in his name totaling approximately $364,000 to be transferred to the Stock Account with no apparent reason other than to shield those assets from investors. T. 290–92, 296–301.

As to the Vero Beach home, the Smiths had purchased a vacation home in Vermont with funds from the Stock Account to be used for skiing vacations when their children, both competitive skiers, were younger. T. 369, 371–72. When the children entered college approximately nine years ago, the Smiths sold the Vermont home and purchased the Vero Beach home again using funds from the Stock Account. T. 371–72. The property was used and enjoyed jointly by the Smiths. T. 372. Title to the Vero Beach home was held jointly in the names of David Smith and Lynn Smith until 2009 when the Smiths caused the title to be transferred into Lynn Smith's name alone. T. 372.

## D. The Trust

In the early 1990s, David Smith caused the Stock Account to purchase 40,000 shares of stock at the initial offering of an Albany-area bank for $400,000. T. 349, 365, 390, 508–09. By August 2004, through bank mergers and acquisitions, the number of shares had increased to approximately 100,000 and their value to over $4 million. T. 313, 365–66, 450–52, 486–87, 508–09, 526. With that stock, David and Lynn Smith created the Trust for the benefit of their two children, now ages thirty and twenty-seven. T. 311–12, 388, 391–92, 450–52, 486–87, 505–06, 526. Thomas Urbelus was selected by the Smiths as Trustee of the Trust and remained in that position until his resignation on April 22, 2010. Urbelus Dep. Tr. (Dkt. No. 66–1) at 10–11, 49–51; T. 312–13, 320, 323, 388–89. Urbelus had remained friends with the Smiths since childhood and the families spent significant time together each year. Urbelus Dep. Tr. at 7–10; T. 313, 389, 507, 566. Urbelus was employed as a lawyer in Boston specializing in real estate. Urbelus Dep. Tr. at 5–6; T. 313.

Throughout Urbelus' tenure as Trustee, David Smith functioned as the Trust's investment advisor and broker. Urbelus Dep. Tr. at 12–14; T. 315–18. When David Smith determined that the Trust should buy or sell an asset, he would prepare the appropriate authorizations, for-

---

on the Stock Account. T. 175–84, 341–43, 384–86. David Smith then gave these blank but signed authorizations to a subordinate to be maintained in the subordinate's desk for use as directed by David Smith. T. 175–84, 384–86, 413–14.

**15.** Over $1.7 million in such loans were made by David Smith to both MS & Co. companies and MS & Co. employees. T. 341, 433–39. They ranged in amounts from $100,000 to $900,000. T. 124–25, 278–79, 341, 433–39. While most loans were repaid within days or weeks with interest, it does not appear that each were memorialized in a writing signed by the loan recipient. T. 433–39.

ward them to Urbelus for his signature, receive them back, and complete the transaction. Urbelus Dep. Tr. at 21–22. At Urbelus' request, David Smith also caused the tax returns for the Trust to be prepared by the Smiths' accountant. Urbelus Dep. Tr. at 11–14; T. 393–94, 448. In most years, David Smith would then issue a personal check to pay the taxes owed by the Trust and Urbelus would cause the Trust to issue checks to Smith in reimbursement. T. 135, 137, 145–48, 394–96, 449, 456–60. In several years, however, David Smith was not reimbursed for paying the Trust's taxes in amounts totaling approximately $100,000. T. 464–66.

From the creation of the Trust until approximately April 14, 2010, the only distributions from the Trust were those to David Smith to reimburse him for paying the Trust's taxes. Urbelus Dep. Tr. at 18, 30–31; T. 135, 137, 145–48, 449, 456–60, 492–98, 553. The only other distribution from the Trust occurred on April 14 or 15, 2010 after David Smith advised his son Jeffrey Smith, that David and Lynn Smith lacked sufficient cash on hand to pay their personal taxes. T. 347, 463, 515–16, 535–36, 540. Jeffrey Smith, the Smiths' son and a beneficiary of the Trust, then directed Urbelus to transfer approximately $95,000 from the Trust to Lynn Smith's checking account, approximately $60,000 of which was used to pay David and Lynn Smith's taxes. Urbelus Dep. Tr. at 16–17; T. 101, 320–21, 397, 416, 463, 513–16; Pl. Ex. 72, Ex. 1. Following Urbelus' resignation as Trustee, David and Lynn Smith selected David Wojeski, an Albany-area Certified Public Accountant, as the new Trustee. T. 548–49.

## II. Discussion

### A. Legal Standard

#### 1. Preliminary Injunction

Pursuant to § 20(b) of the Securities Act[16] and § 21(d) of the Exchange Act,[17] the Securities and Exchange Commission ("SEC") is entitled to seek injunctive relief in the face of alleged statutory violations. 15 U.S.C. §§ 77t(b), 78u(d). "The crafting of a remedy for violations of the [securities acts] lies within the district court's broad equitable discretion." *SEC v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir.1997); *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1035 (2d Cir.1990) ("When Congress grants district courts jurisdiction to enjoin those violating or about to violate federal statutes, it is authorizing the exercise of equity practice with a background of several hundred years of history") (internal

---

**16.** This Section provides that:

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this subchapter, or of any rule or regulation prescribed under authority thereof, the Commission may, in its discretion, bring an action in any district court of the United States, or United States court of any Territory, to enjoin such acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 77t(b).

**17.** This Section provides that:

Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, [or the rules of exchanges and other registered entities] .... it may in its discretion bring an action in the proper district court of the United States, the United States District Court for the District of Columbia, or the United States courts of any territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

15 U.S.C. § 78u(d).

quotation marks and citations omitted); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1103 (2d Cir.1972) (explaining the equitable powers granted to the district court and holding that when there is "a showing of a securities law violation, the court possesses the necessary power to fashion an appropriate remedy.").

 In the Second Circuit, injunctions sought by the SEC do not require a show[ing of] a risk of irreparable harm or the unavailability of remedies at law. *Unifund*, 910 F.2d at 1036 (citations omitted). Thus, "[a] preliminary injunction enjoining violations of the securities law is appropriate if the SEC makes a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir.1998) (citing *Unifund*, 910 F.2d at 1039–40). However, a less burdensome standard is involved with freezing assets, requiring the SEC to "establish only that it is likely to succeed on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *SEC v. Byers*, No. 08–CV–7104, 2009 WL 33434, at *3 (S.D.N.Y. Jan. 7, 2009) *aff'd* 609 F.3d 87 (2d Cir.2010) (citing *Cavanagh*, 155 F.3d at 136 ("The standard of review for an injunction freezing assets of a relief defendant is whether the SEC has shown that it is likely to succeed on the merits."), *Unifund*, 910 F.2d at 1041 (finding an asset freeze appropriate because "[t]here is a basis to infer that the appellants traded on inside information . . . .")); *see also SEC v. Heden*, 51 F.Supp.2d 296, 298 (S.D.N.Y.1999) ("Unlike a preliminary injunction enjoining a violation of the securities laws, which requires the SEC to make a substantial showing of likelihood of success as to both a current violation and the risk of repetition, an asset freeze requires a lesser showing") (citations omitted).

Such asset freezes may "apply to nonparties, such as relief defendants allegedly holding the funds of defendants." *Heden*, 51 F.Supp.2d at 299 (citations omitted). In these cases, a showing of future statutory violations is not necessary "because [the SEC] is not accusing the [relief] defendant of any wrongdoing." *Cavanagh*, 155 F.3d at 136 (citing *Unifund*, 910 F.2d at 1041 ("[T]he freeze order does not place appellants at risk of contempt in all future securities transactions. It simply assures that any funds that may become due can be collected.")); *see also Byers*, 2009 WL 33434, at *3 (explaining that relief defendants "have not been accused of wrongdoing, but are merely in possession of assets or property that the SEC claims is illgotten and seeks to recover.") (citations omitted).

### 2. Relief Defendants

 "Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *Cavanagh*, 155 F.3d at 136. "The burden rests with the Commission to show that the funds in the possession of [the relief defendant] are ill-gotten." *FTC v. Bronson Partners, LLC*, 674 F.Supp.2d 373, 392 (D.Conn.2009) (citations omitted).

 "The ill-gotten gains must be linked to the unlawful practices of the liable defendants." *Bronson Partners, LLC*, 674 F.Supp.2d at 392. Where "it would be difficult, if not impossible, to trace specific . . . [fraudulently obtained funds], a freeze order need not be limited . . . to funds that can be directly traced to defendant's illegal activity [because] . . . the defendant should not benefit from the fact that he commingled his illegal profits with other assets." *Byers*, 2009 WL 33434, at *3 (citations omitted); *see also*

*SEC v. Aragon Capital Mgmt., LLC*, 672 F.Supp.2d 421, 443 (S.D.N.Y.2009) (holding that tracing proceeds of illegal funds is unnecessary and, "where tainted funds have been commingled with potentially legitimate funds, the SEC is entitled to obtain disgorgement from the entire pool of funds.").

If disgorgement of "fraudulently obtained profits" becomes necessary, the court is granted the ability "to determine how and to whom the money will be distributed," keeping in mind that "[t]he primary purpose of disgorgement ... is to deter violations of the securities laws by depriving violators of their ill-gotten gains." *SEC v. Fischbach*, 133 F.3d 170, 175 (2d Cir.1997) (citations omitted). "Although disgorged funds may often go to compensate securities fraud victims for their losses, such compensation is a distinctly secondary goal. Thus the measure of losses need not be tied to the losses suffered by defrauded investors...." *Id.* at 175–76. Rather, the measure of damages revolves around the defendants' "unjust enrichment ... [with the] court ... focus[ed] on the extent to which a defendant has profited from his fraud." *SEC v. Universal Exp., Inc.*, 646 F.Supp.2d 552, 563 (S.D.N.Y.2009) (citations omitted) (hereinafter "*Universal Exp. II*").

The second factor is met when "the SEC is likely to be able to show that [the relief defendant] gave no consideration for the [ill-gotten gains received] ..." *Cavanagh*, 155 F.3d at 137; *see also FTC v. Bronson Partners, LLC*, 674 F.Supp.2d 373, 392 (D.Conn.2009) ("A relief defendant can show a legitimate claim to the funds received by showing that some services were performed in consideration for the monies."); *Aragon Capital Mgmt.*, 672 F.Supp.2d at 444 (classifying relief defendants as "gratuitous transferees who had no legal claim against the pooled

funds...."). For legitimate interests to be established, more than conclusory evidence need be proffered. *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (4th Cir.2002) ("[A] claimed ownership interest must not only be recognized in law; it must also be valid in fact. Otherwise, individuals and institutions holding funds on behalf of wrongdoers would be able to avoid disgorgement ... simply by stating a claim of ownership, however specious."); *SEC v. Better Life Club of Am., Inc.*, 995 F.Supp. 167, 182–83 (D.D.C.1998) (examining assets of relief defendant and concluding that supposed payment for an informal loan given without documentation was subject to disgorgement because "investors received no value on this loan, and it is highly suspect that [the relief defendant] gave any value to [the defendant]," but mortgage payments for which the relief defendant held cancelled checks and a recorded credit for the down payment of a car likely represented untainted funds which were subject to return to the relief defendant).

Other courts have held that establishment of a debtor-creditor relationship provides sufficient evidence of a legitimate ownership interest. *See Janvey v. Adams*, 588 F.3d 831, 835 (5th Cir.2009) (concluding that receipt of "proceeds pursuant to written certificate of deposit agreements ... well before the underlying SEC enforcement action constituted a debtor-creditor relationship which provided a legitimate ownership interest in relief defendants"); *SEC v. Founding Partners Capital Mgmt.*, 639 F.Supp.2d 1291, 1294 (M.D.Fla.2009) (finding a legitimate ownership interest where relief defendant "received the loan proceeds pursuant to written loan agreements ... which g[ave the relief defendant] certain rights and obligations....").

■ Regardless of the relationship between the relief defendant and the defendant, "it is not appropriate to continue [an] asset freeze with respect to the amount . . . ." initially deposited in the relief defendant's account or that which was used to purchase a legitimate investments which was used in a fraudulent manner. *Heden,* 51 F.Supp.2d at 302. "There is no authority for the proposition that the *Cavanagh* test applies to any assets of a relief defendant other than the profits from an illegal trade." *Id.* at 302 n. 4; *see also Cavanagh,* 155 F.3d at 137 ("[T]he frozen assets are limited to the proceeds of the stock at issue, and the preliminary injunction has no effect on any assets of [relief defendant's] that are not the product of the alleged securities law violations.").

### 3. Joint Ownership

■ Where a defendant and relief defendant jointly own an asset, the central inquiry concerns "the element of control [implicating] . . . the concept of equitable ownership." *In re Vebeliunas,* 332 F.3d 85, 92 (2d Cir.2003) (citations omitted).[18] Such ownership is established when "an individual . . . exercises considerable authority over the [asset] . . . acting as though its assets are his alone to manage and distribute. . . ." *Id.* (internal quotation marks and citations omitted); *see also Whiting v. Dow Chemical Co.,* 523 F.2d 680 (2d Cir.1975) ("In a traditional sense, in the absence of a statutory definition, a beneficial owner would be a person who does not have the legal title to the securities but who is, nevertheless, the beneficiary of a trust or joint venture. . . .").

In *Heden,* the court considered whether a continued freeze on relief defendants' accounts was appropriate where relatives of the relief defendants used their accounts to broker transactions which allegedly violated the Securities and Exchange Act. *SEC v. Heden,* 51 F.Supp.2d 296 (S.D.N.Y. 1999). The court discussed the actions of two different defendants and relief defendant accounts. The first defendant claimed ownership over, and had a power of attorney for, the relief defendant's account for at least seven years, repeatedly used the relief defendant's principal in the account to facilitate stock purchases, made transactions between his personal accounts and that of the relief defendant, and made such transactions in the face of specific prohibitions from defendant's employer. *Id.* at 300. The second defendant had full control over the relief defendant's account, though it had only been in existence for a month, but the second defendant had no interest in the account, had not benefitted from the account, and had not used the account as his own. *Id.* at 301. The court held that:

> If an asset belonging to a relief defendant is, in reality, also an asset of a defendant, then the freeze sought is against the defendant's assets . . . Accordingly, it is inappropriate to apply the two-part *Cavanagh* test to determine whether a 'relief defendant's' principal should remain frozen. Rather, [the court] need only determine whether the SEC has met its burden of showing that it is likely to succeed on the merits.

*Heden,* 51 F.Supp.2d at 299–300. In determining joint ownership, the *Heden* court considered a defendant's control over the asset, the length of time the asset had

---

**18.** This case also discusses piercing a trust pursuant to the alter ego theory under New York law. *Vebeliunas,* 332 F.3d at 91. The court held that, in those cases where New York courts allowed a trust to be pierced, there was a showing "that the respective parties used trusts to conceal assets or engaged in fraudulent conveyances to shield funds from adverse judgments." *Id.*

been held, whether the defendant had an interest in and benefitted from the asset, whether the defendant had transferred assets from his name into the asset, whether he or she contributed to acquire the asset initially, and whether the defendant ever withdrew any funds from the asset. *Id.* at 301. Where a defendant treated an asset as his own, the asset should be treated as that of the defendant and the *Cavanagh* test becomes irrelevant. *Id.* at 300.

However, the Second Circuit also examined a similar issue with respect to piercing the veil of a trust in which the trustee's husband had been fraudulently using the trust as his own. *Vebeliunas,* 332 F.3d 85. In that case, the wife created an irrevocable trust, to which she was the sole trustee, and to which her husband was a 20% beneficiary of the distributions from the trust. *Id.* at 88. The husband nevertheless fraudulently represented to various creditors that he was the full beneficiary and had present access and ownership over the trust's corpus. *Id.* at 88–89. Criminal and bankruptcy proceedings ensued. *Id.* at 89. The Second Circuit refused to pierce the trust on behalf of the husband's creditors because even though the husband "exercised control over the trust and its property . . . and paid virtually all of the expenses associated with the . . . trust . . . , spouses routinely administer each other's assets and conduct business on behalf of each other" [19] and such actions

did not confer equitable ownership of the trust's corpus upon the husband. *Vebeliunas,* 332 F.3d at 93. "The mere fact that [the husband] acted as an agent for his wife does not divest her of her equitable ownership. . . ." *Vebeliunas,* 332 F.3d at 93.

### 4. Adverse Inferences

On February 1–3 and 12, 2010, David Smith testified under oath in the FINRA proceeding and the transcript of that testimony was offered in evidence here by the SEC. Pl. Exs. 20–23. The SEC sought the testimony of McGinn and David Smith for the hearing on this motion,[20] Both declined to testify on the ground of their Fifth Amendment privilege against self-incrimination, and, in lieu of an appearance at the hearing, both signed declarations stating that they asserted their Fifth Amendment privilege as to all matters alleged in the complaint and in the pending motion for a preliminary injunction. Pl. Exs. 128, 129. The SEC contends that on this motion, it is entitled to adverse inferences against the defendants as well as against Lynn Smith and the Trust from the invocation of privilege by McGinn and David Smith. SEC Mem. of Law (Dkt. No. 74). Lynn Smith and the Trust oppose the contention. Dkt. Nos. 79, 80.

■ A party testifying in a civil proceeding retains the right under the Fifth Amendment to refuse to answer questions

---

19. The Second Circuit also outlined a litany of factors which, it concluded, did not establish equitable ownership by the husband. *Vebeliunas,* 332 F.3d at 92. The court stated that "none of the [trust] benefits flowed solely to [the husband]. Rather, all of the benefits . . . flowed jointly to him and his wife, which is consistent with [the wife's] equitable ownership of the property." *Id.* Moreover, the husband's receipt and use of the trust corpus, primarily property and rent proceeds, "did not evidence control over the property, as spouses routinely share certain financial as-

sets, such as streams of income . . . [and] a homeowner would be expected to allow her spouse . . . to live rent-free in her home." *Id.* Lastly, as New York is not a community property state, actions such as filing joint tax returns regarding the property in question did not indicate that equitable ownership was granted to the husband. *Id.*

20. The Trust also sought to call David Smith as its witness. *See* Trust Mem. of Law (Dkt. No. 80) at 1.

if the answers might tend to incriminate him or her, but an adverse party may then be entitled to have the trier of fact " 'draw a negative inference from the invocation of that right.' " *Wechsler v. Hunt Health Sys., Ltd.,* No. 94–CV–8294(PKL), 2003 WL 21998980, at *2 (S.D.N.Y. Aug. 22, 2003) (quoting *Baxter v. Palmigiano,* 425 U.S. 308, 318–20, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)); *see also Brink's, Inc. v. City of New York,* 717 F.2d 700, 710 (2d Cir. 1983). Any inference drawn from the invocation of the privilege must be reasonable under the circumstances. *See Brink's, Inc.,* 717 F.2d at 710. Thus, on these motions, the invocation of the Fifth Amendment privilege by David Smith and McGinn will permit whatever negative inferences are reasonable under the circumstances in favor of the SEC at least as to the defendants. *Willingham v. County of Albany,* 593 F.Supp.2d 446, 452 (N.D.N.Y. 2006).

■■■■■ The circumstances presented here, however, include two significant obstacles to the SEC's contention. First, David Smith testified for four days at the FINRA proceedings only two months before the complaint herein was filed. The transcript of David Smith's testimony from that proceeding comprises 1,091 pages. Pl. Exs. 20–23. The FINRA investigation and the allegations in this case substantially overlap and the questions answered by David Smith during his FINRA testimony address matters about which the SEC sought David Smith's testimony at the hearing in this case. *Compare* Pl. Ex. 20–23 *with* Pl. Ex. 128 at ¶ 6(A)-(II). The purpose underlying the allowance of an adverse inference in civil cases is equitable, not punitive, and serves to vitiate the prejudice to the party denied evidence by invocation of the privilege. *See United States v. 4003–4005 5th Ave.,* 55 F.3d 78, 82–83 (2d Cir.1995). In those instances

where David Smith answered a question during the FINRA hearing, the SEC has not been denied David Smith's testimony as to an answered question and no basis exists for an adverse inference there. Thus, the SEC is entitled to adverse inferences only to the extent that the questions to which David Smith asserted the privilege were not otherwise answered during his testimony in the FINRA investigation.

■■■ To that limited extent, then, the SEC is entitled to adverse inferences against McGinn and David Smith. They have consented to the relief sought in this motion, however, and the question of what inferences may be drawn against them is largely moot. The second impediment relates to the SEC's contention that adverse inferences should be drawn against Lynn Smith and the Trust and is not moot. In *LiButti v. United States,* 107 F.3d 110 (2d Cir.1997), the Second Circuit held that where one party declines to answer questions in a civil case on the basis of the Fifth Amendment privilege against self-incrimination, adverse inferences may be drawn against another associated with the witness depending on the circumstances of the particular case. *Id.* at 120–21. The court identified "a number of nonexclusive factors" to guide this determination, including the nature of the relevant relationships, the degree of control over the non-testifying witness, the compatibility of the interests between the non-testifying witness and the party, and the role of the non-testifying witness in the litigation. *Id.* at 123–24. However, "[w]hether these or other circumstances unique to a particular case are considered by the trial court, the overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *Id.* at 124.

Although *LiButti* concerned inferences to be drawn from a non-party's invocation of the privilege, its analysis is equally applicable here where the SEC seeks to apply adverse inferences from a party's invocation of the privilege against two purported relief defendants with interests in the outcome of this motion but who are non-parties. *See Willingham*, 593 F.Supp.2d at 453 (applying adverse inferences to one party but not others under *LiButti*); *John Paul Mitchell Sys. v. Quality King Distrib., Inc.*, 106 F.Supp.2d 462, 471 (S.D.N.Y.2000) (relying on *LiButti* to support determination to apply adverse inferences against defendants' company on motion for a preliminary injunction).

As to the first *LiButti* factor, David Smith has been married to Lynn Smith for forty-two years. They closely share marital, familial, financial, and social ties. For purposes of this analysis, this relationship could not be closer. As to the Trust, David Smith was a co-grantor of the Trust, has always advised on and managed its investments, helped select a childhood friend as its first trustee, assumed responsibility for the Trust's tax returns and payments, and paid those taxes without reimbursement on occasion. Therefore, the relationship between David Smith and the Trust was also very close. While David Smith exercised control over Lynn Smith's finances and influence over those of the Trust, it cannot be said that either Lynn Smith or the Trust exercised any degree of control over David Smith.[21] The interests of David Smith and of Lynn Smith and the Trust are, and have always been, identical. Finally, David Smith plays a central role both in this litigation and, more importantly here, in the financial affairs of Lynn Smith and the Trust as a whole.

■ Balancing these factors, it is clear that neither Lynn Smith nor the Trust controlled David Smith for purposes of this analysis. Nevertheless, given the nature of the relationships, the complete identity of interests, and David Smith's role both in this litigation and as to Lynn Smith and the Trust, the absence of significant control over David Smith is far outweighed by the other factors. Accordingly, any adverse inferences which can be drawn from David Smith's invocation of his privilege should be applied against Lynn Smith and the Trust.

■ The question then becomes what adverse inferences should be drawn and what evidentiary weight should they carry. The SEC contends that the following three inferences should be drawn:

*First*, adverse inferences should be drawn against Smith and McGinn concerning the evidence regarding likelihood of success on the merits.

*Second*, adverse inferences should be drawn against David Smith concerning the evidence regarding the David and Lynn Smith Irrevocable Trust, the Stock Account, the Checking Account, and the Vero Beach house; and against Timothy McGinn as to the Niskayuna house.

*Third*, adverse inferences should be drawn against Lynn Smith, based on David Smith's assertion of the Fifth Amendment, with regard to all issues concerning the Trust, the Stock Account,

---

**21.** The Stock Account was always held solely in Lynn Smith's name and, therefore, it was within her power to control David Smith's management of the account. There is no credible evidence that Lynn Smith ever did so, however, perhaps due to the account's impressive growth under David Smith's management. In these circumstances, Lynn Smith's failure to exercise any control for decades over David Smith's management of the Stock Account manifests the absence of control.

the Checking Account, and the Vero Beach house

Pl. Mem. of Law (Dkt. No. 74) at 1. These contentions, however, appear to confuse evidentiary inferences with issue preclusion. An inference permits a finder of fact to conclude that evidence of a particular fact exists which is unfavorable to the party against whom the inference is drawn. *See Henning v. Union Pacific R. Co.*, 530 F.3d 1206, 1219–20 (10th Cir.2008); An adverse inference is permissive, not mandatory, and an adverse inference alone is insufficient to establish entitlement to relief. *See JHP & Associates, LLC v. N.L.R.B.*, 360 F.3d 904, 910 (8th Cir.2004) (holding that adverse inference rule is permissive); *3M v. Pribyl*, 259 F.3d 587, 606 n. 5 (7th Cir.2001) (explaining that the adverse inference which the jury could permissibly have drawn did not relieve the plaintiff of the burden of proving the elements of its claims); *SEC v. Colello*, 139 F.3d 674, 677–78 (9th Cir.1998) (holding that adverse inference alone insufficient to support a motion for summary judgment); *Blinzler v. Marriott Intern.*, 81 F.3d 1148, 1158–59 (1st Cir.1996) (holding that adverse inferences are permissive, not mandatory); *Daniels v. Pipefitters' Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir.1993) (finding that the adverse inference to be drawn from the invocation of the Fifth Amendment is permissive rather than mandatory).

Although immaterial in light of the consent of David Smith and McGinn to the preliminary injunction, an adverse inference is appropriate against them as to the likelihood of success on the merits on this motion. Lynn Smith has nominally opposed that element of the SEC's motion. However, it pertains solely to the named defendants and requires the SEC to demonstrate that it is more likely than not that it will prevail on the merits of this action as to the defendants. Lynn Smith is named only as a relief defendant and is involved, therefore, only in questions of relief if the SEC prevails on its claims. The Trust does not oppose the SEC's motion as to that element. An adverse inference against David Smith and McGinn on this element is also supported by equitable considerations where such inferences are drawn against parties declining to provide evidence rather than against third parties. For the same reason as well as the existence and strength of evidence corroborating those inferences also appear reliable.

■ A different conclusion is compelled as to Lynn Smith and the Trust, however. While adverse inferences against them are permissible under *LiButti* as discussed *supra*, other factors lead to the conclusion that they should not be drawn. First, as to Lynn Smith, David Smith's testimony at the FINRA proceeding included answers to certain questions relevant here. For example, David Smith testified that he and his wife had maintained separate finances for twenty years although they always filed joint tax returns. Pl. Ex. 20 at 278–79. David Smith declined to answer other questions about his wife's finances. *Id.* at 279–92. Serious questions exist about the credibility of David Smith's limited testimony as they do for Lynn Smith's testimony. *See* note 12 *supra*. However, as to those questions which are relevant here and which David Smith answered in the FINRA proceeding, the SEC has obtained sworn answers rendering unwarranted adverse inferences as to those matters.

Moreover, not only the SEC but also Lynn Smith and the Trust were deprived of the testimony of David Smith. As noted, the Trust had served a subpoena on David Smith to testify at the hearing on this motion. Trust Mem. at 1. David Smith's invocation of his Fifth Amendment

privilege thus denied his testimony to the parties against whom the SEC seeks the adverse inferences, just as the SEC was denied. Therefore, in these circumstances, imposing adverse inferences against Lynn Smith and the Trust would be inequitable and the reliability of any such inferences is substantially undermined.

Finally, on the record of this case, the importance of the adverse inferences is insignificant. The exhibits include voluminous records of the transactions of the defendants, Lynn Smith, and the Trust. The record also includes the testimony of numerous witnesses, live and by deposition and affidavit, during three days of testimony. In these circumstances, that evidence, particularly the documentary evidence, far outweighs the probative value of any inferences to be drawn from David Smith's invocation of privilege. Therefore, whether adverse inferences are, or are not drawn, as to any matter at issue on this motion would not affect the outcome in any respect.

Accordingly, adverse inferences from the invocation of the Fifth Amendment privilege against self-incrimination by David Smith and McGinn will be drawn against those two defendants but not against Lynn Smith or the Trust.

## B. Likelihood of Success

Section 10(b) of the Exchange Act "prohibit[s] fraud, manipulation, or insider trading....." 15 U.S.C. § 78j; *see also Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 161 (2d Cir.2000) ("Section 10(b) of the Exchange Act bars conduct involving manipulation or deception ... that [is] intended to mislead investors by artificially affecting market activity, and deception being misrepresentation, or nondisclosure intended to deceive.").[22] Also, Section 17(a) of the Securities Act functions in conjunction with Section 10(b) of the Exchange Act to "prohibit fraud in the offer, purchase, and sale of securities." *SEC v. Global Telecom Servs., L.L.C.,* 325 F.Supp.2d 94, 111 (D.Conn.2004) (citations omitted). Similarly, Section 15(c) of the Exchange Act "prohibits a broker or dealer from using any manipulative or deceptive device ... to induce or attempt to induce the purchase or sale of any security." *SEC v. George,* 426 F.3d 786, 792 (6th Cir.2005).

To prove any, or all, of these violations, the SEC must establish that the defendant made material false statements or omissions [23], with scienter [24], in connection with the securities exchange. *See Ganino,* 228 F.3d at 161(holding that for a Section 10(b) violation the SEC must prove "that the defendant, in connection with the purchase or sale of securities, made a materially

**22.** Rule 10b–5 prohibits the same conduct in connection with the purchase or sale of securities as does § 10(b) of the Exchange Act. *See Cyber Media Group, Inc. v. Island Mortgage Network, Inc.,* 183 F.Supp.2d 559, 569 (E.D.N.Y.2002) (citing *IBM Corp. Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998)) (discussing the test which applies to both provisions).

**23.** A statement or fact "is material if there is a substantial likelihood that a reasonable [investor] would consider it important...." *Basic Inc. v. Levinson,* 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (internal quotation marks and citations omitted).

**24.** Scienter is defined as an "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). In the Second Circuit, scienter can be established by reckless conduct. *See e.g., Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44–48 (2d Cir.1978). Such conduct "is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 47.

false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff.") (citations omitted); *Global Telecom.*, 325 F.Supp.2d at 111(concluding that in order to prevail on a § 17(a) violation the SEC must show that "defendant (1) ma[de] a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.") (citations omitted); *George*, 426 F.3d at 792 ("The elements of a § 15(c)(1) violation are the same as those for a violation of [Section 10(b) of the Exchange Act and Rule 10b–5], with a similar scienter requirement that a statement be made with knowledge or reasonable grounds to believe that it is untrue or misleading.") (internal quotations and citations omitted).

▆▆▆▆ "Section 5 of the Securities Act prohibits issuers, underwriters and dealers from selling or offering to sell unregistered securities." *SEC v. Tecumseh Holdings Corp.*, No. 03–CV–5490, 2009 WL 4975263, at *2 (S.D.N.Y. Dec. 22, 2009) (citations omitted). In order to establish a violation of this section the SEC must prove "(1) [t]hat the defendant directly or indirectly sold or offered to sell securities[25]; (2) that no registration statement was in effect for the subject securities; and (3) that interstate means were used in connection with the offer or sale." *SEC v. Universal Exp., Inc.*, 475 F.Supp.2d 412, 422 (S.D.N.Y.2007) (hereinafter "*Universal Exp. I*") (citations omitted). "Liability does not require that the defendant actually passed title of the security. Any person engaged in steps necessary to the distribution of the unregistered security is liable under Section 5." *Tecumseh*, 2009 WL 4975263, at *3 (citations omitted).

▆▆▆▆ Sections 206(1) and 206(2) of the Advisers Act "prohibits investment advisers from employing any device, scheme, or artifice to defraud any client or prospective client ... [or] engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." *SEC v. Treadway*, 430 F.Supp.2d 293, 338 (S.D.N.Y.2006) (citing 15 U.S.C. § 80b–6(1) & (2)) (internal quotation marks omitted). "Section 206(1) requires fraudulent intent, while § 206(2) requires only negligence." *Id.* (citations omitted). By enacting this provision, Congress "establishe[d] a statutory fiduciary duty for investment advisers to act for the benefit of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients." *SEC v. Moran*, 922 F.Supp. 867, 895–96 (S.D.N.Y.1996) (citations omitted). Additionally, § 206(4) also prohibits investment advisors from "directly or indirectly ...

---

**25.** A Second Circuit test, adopted by the Supreme Court, dictates the method by which the court should "decid[e] whether a transaction involves a 'security.' " *Reves v. Ernst & Young*, 494 U.S. 56, 66, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). Securities are defined first by the motivation of the seller, stating that "[i]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument Is likely to be a 'security.' " *Id.* Second, the court evaluates "the plan of distribution." *Id.* (internal question marks and citations omitted). Third, the court determines "the reasonable expectations of the investing public," naming those instruments securities to which the public attaches such a definition. *Id.* (citations omitted). Finally, the court is to consider "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Acts unnecessary." *Id.* at 67, 110 S.Ct. 945 (citations omitted).

engag[ing] in any transaction, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b–6(4).[26]

Finally, § 7(a) of the Investment Company Act prohibits interstate commerce, namely the offering or selling of securities, by unregistered investment companies. 15 U.S.C. § 80a–7.

### 1. The Defendants

From the unrebutted submissions of the SEC, the SEC has demonstrated a substantial likelihood of success on its claims against McGinn, David Smith, and the other named defendants. *See, e.g.,* Mehraban Decl. I; Pl. Exs. 1–67. Moreover, as discussed *supra,* adverse inferences are drawn against McGinn, David Smith, and the other defendants, which were controlled by McGinn and David Smith, from the invocation of the Fifth Amendment privilege by McGinn and David Smith. Finally, all defendants have consented to the entry of the relief sought by the SEC in this motion. Accordingly, the SEC has satisfied its burden of proof on this element of its motion and the motion is granted as to all defendants.

### 2. Lynn Smith

The SEC has argued that Lynn Smith is an appropriate relief defendant and thus the asset freeze should continue as to assets held presently in her name alone. Those assets include the Stock Account, the Vero Beach home, the Great Sacandaga camp, and Lynn Smith's checking account. In the alternative, the SEC also contends that David Smith is a joint owner of the Stock Account, the Vero Beach home, and the checking account so that, even if Lynn Smith is not properly named as a relief defendant, these assets are still a personal asset of his which should remain frozen. Lynn Smith argues that the SEC has failed to establish that she is appropriately named as a relief defendant as these assets do not contain or derive from ill-gotten gains and she has always maintained sole ownership and control of them.

### a. Relief Defendant

■ In this instance, Lynn Smith has likely received ill-gotten gains throughout the multiple deposits into her stock account after 2003 when the fraudulent scheme involving the Four Funds alleged by the SEC commenced. Since 2003, Lynn Smith has been refunded over $1 million from MS & Co. and its related individuals and entities in loan repayments. These payments include $375,000 in December 2007 (T. 434); $325,000 in June and July of 2009 (T. 98–99, 115–18, 381–82); $100,000 in March 2010 (T. 438–39); and $185,000 in October 2006 and May 2007 (T. 124–25). These payments derived from fraudulently obtained investments. As such, Lynn Smith received loan repayments from ill-gotten gains. Because all of these payments were commingled with potentially legitimate funds, separating the legitimately held funds in the Stock Account and the checking account from the fraudulently obtained funds would be nearly impossible and the SEC is

---

**26.** Section 206(4) is applicable to pooled investment vehicles, 17 C.F.R. § 275.206(4)–8. Pooled investment vehicles are "any investment company as defined in section 3(a) of the Investment Company Act...." *Id.* § 275.206(4)–8(b). An investment company, pursuant to the Investment Act, is one which "is or holds itself out as being engaged primarily, or proposes to engage primarily, in the business of investing, reinvesting, or trading in securities." 15 U.S.C. § 80a–3. Liability may be found where an investment adviser makes a false statement of material fact to an investor, realized or prospective, or fails to disclose material facts necessary to make statements made to investors be truthful. 17 C.F.R. § 275.206(4)–8(a).

entitled to freeze the entirety of the accounts. *Aragon Capital Mgmt.*, 672 F.Supp.2d at 443.

Moreover, Lynn Smith has failed to establish a legitimate interest in the return of the funds which she received from MS & Co. after 2003. It is undisputed that Lynn Smith provided McGinn Smith with multiple loans, the number and amounts of which increased in recent years. T. 330. Lynn Smith testified that she was a bona fide creditor and was entitled to repayment of those loans with interest. T. 378–81. However, Lynn Smith has unaware how many loans she has made, to whom the loans were made, what they were for, or what the interest rates and payment schedules were. T. 330–32, 409–11.[27] Lynn Smith made two loans to McGinn totaling $915,000 ($900,000 in 2004 and another $15,000 in 2009) and was only recently repaid $185,000, $85,000 in October 2006 and $100,000 in May 2007. T. 124–25, 278–79, 431–33; Pl. Ex. 75. Additionally, Lynn Smith made loans of $2 million $6 million for which she had no recollection of terms or conditions. T. 339, 345–46, 379. Such conduct belies any claim of a legitimate creditor-debtor relationship. Accordingly, these claims by Lynn Smith are rejected. *Kimberlynn Creek Ranch*, 276 F.3d at 192.

In support of her claims of being a bona fide creditor, Lynn Smith testified that she always made the final decision as to whether to approve any loans or transactions from the Stock Account. These decisions were memorialized in letters of authorization signed by Lynn Smith which provided consent for monetary transfers from the Stock Account to third parties. When Lynn Smith pre-signed the letters of authorization, the forms were blank as to the amount of the transfers from the Stock Account. T. 219. The forms were pre-signed, in batches of 10–15 at a time, or

Lynn Smith's signature was signed by David Smith which David Smith would use at his option. T. 341–43, 384–86. No other client provided pre-signed authorization forms to MS & Co to be utilized whenever deemed appropriate. T. 191, 218. These authorizations were maintained by one of David Smith's subordinates for use by David Smith. T. 384–86, 413–14. Such uninformed, casual, and informal transactions in the amounts at issue here corroborate the conclusion that there was no consideration and no contractual relationship which would entitle Lynn Smith to repayment as an arms length, disinterested creditor. *Founding Partners Capital*, 639 F.Supp.2d at 1294; *Better Life Club*, 995 F.Supp. at 182–83.

Therefore, the SEC has demonstrated a substantial likelihood of success in proving that Lynn Smith is an appropriate relief defendant with respect to the Stock Account and that her Stock Account includes ill-gotten gains to which she has no legitimate claim of ownership. Accordingly, the SEC's motion as to the Stock Account on this ground is granted and the Stock Account shall remain frozen.

**b. Equitable or Joint Ownership**

■ The SEC contends that Lynn Smith's assets are also subject to its motion because they were jointly owned by David Smith. As to the Stock Account, even if Lynn Smith is not an appropriate relief defendant or the legitimate funds in her Stock Account could be separated, it is of no consequence because David Smith was the joint owner of the Stock Account. Since the Stock Account was one of his assets, "it is inappropriate to apply the two-part *Cavanagh* test ... [r]ather, [the court] need only determine whether the SEC has met its burden of showing that it

---

**27.** *See also* note 13 *supra.*

is likely to succeed on the merits." *Heden*, 51 F.Supp.2d at 299–300. To determine whether David Smith was the joint owner of the Stock Account, various factors must be considered. They include the length of time the Stock Account was established and David Smith's access to that account, whether David Smith had an interest in and benefitted from the Stock Account, and whether David Smith freely transferred his own assets into the Stock Account or withdrew the account's assets for his purposes. *Heden*, 51 F.Supp.2d at 301.

■■ The Stock Account has been in existence for approximately forty-two years. Lynn Smith Aff. at ¶¶ 13, 14; T. 326, 355–58. David Smith had unfettered control over the account, acting as its broker, for approximately thirty-five years. T. 360. As previously discussed, David Smith directed transfers from the account at his sole option by the blank letters of authorization which Lynn Smith signed. The letters of authorization were used at the direction of David Smith to transfer money from the account into the MS & Co-related businesses for bridge loans and for operating expenses usually in the range of $100,000–$1 million. *See, e.g.,* T. 339–40, 433 (bridge loan to MS Funding for $375,000); T. 341 (bridge loan to TDM Benchmark of $100,000); T. 437–38 (bridge loan to TDMM Cable Funding for $366,000); T. 341–42. For these reasons, it is clear that David Smith had complete access to and control over the account and that such access and control were maintained for decades.

Additionally, David Smith benefitted from the Stock Account. First, the account was used to purchase jointly owned residences including their primary residences and vacation homes in Vermont and Florida and finance their children's college educations. T. 279–81, 328–29, 350–51, 368–72, 404. Furthermore, the account was used to fund MS & Co.'s operating expenses as MS & Co. increasingly experienced difficulties meeting its obligations in 2008–10. T. 329–31, 378. These loans ensured that MS & Co. would continue to operate. T. 410–11. Thus, David Smith utilized the Stock Account as a personal line of credit for his business interests to further his personal and professional endeavors.

Finally, the record establishes that David Smith treated the Stock Account as his own. As previously discussed, David Smith used the account to make bridge loans to keep his business going. Furthermore, David Smith occasionally deposited his assets into the stock account. In 2009, David Smith directed that $38,430 be deposited into the Stock Account, proceeds from assets held by David Smith in his name alone since the late 1990s. Dkt. No. 23, Lynn Smith Aff. at ¶ 33(a); T. 298, 435, 474–75. Additionally, David Smith also had the funds of a trust, totaling $326,304 and a note receivable totaling $410,000, both in his name alone, deposited in the Stock Account. T. 290–92, 296, 436–37, 475–76; Pl. Ex. 118. Thus, David Smith also deposited his personal assets into the Stock Account.

The record establishes that David Smith acted almost identically to the defendant, Goran Heden, in the *Heden* case. Like Heden, Smith "viewed and treated the [stock] account and his own account[s] interchangeably." *Heden*, 51 F.Supp.2d at 300. Smith had access and control over the account for decades, he had both a personal and professional interest in the Stock Account and benefitted from its funds in both his home-life and career, and he commingled funds between the Stock Account and his business and personal accounts. As such, the SEC need not establish that Lynn Smith is a proper relief defendant but only that there is a likeli-

hood of success against David Smith to continue the asset freeze as to the Stock Account. The SEC has made such a showing. Therefore, in the alternative, the SEC's motion for as to the stock account is granted on this ground as well.

■ The record as to the Vero Beach home and the checking account in Lynn Smith's name is essentially the same. The Vero Beach home was purchased with proceeds derived from the ?Stock Account and was held jointly by the Smiths until 2009 when it was transferred into the name of Lynn Smith alone without fair consideration. The Smiths maintained a joint checking account throughout their marriage from which they paid their various expenses. Also in 2009, Lynn Smith opened a checking account in her name for the first time and thereafter deposited funds and paid expenses into and out of the account which had previously been deposited into and paid from the joint checking account. These actions in 2009 followed the commencement of the FINRA proceedings in which David Smith faced the distinct possibility that his assets could be seized to pay judgments awarded to investors. The two assets were treated no differently by the Smiths after the 2009 transfers and were at all time used jointly by the Smiths for their mutual benefit. Thus, the SEC has demonstrated a likelihood of success in proving that these assets were jointly owned by David Smith and that the 2009 transfers into Lynn Smith's name alone were solely for the fraudulent purpose of shielding David Smith's assets from seizure. The SEC's motion as to these assets is also granted.

As to the Great Sacandaga Lake camp, the record demonstrates without contradiction that this property was inherited by Lynn Smith from her father in 1969, remained in her name alone since that time, David Smith's only interest in the asset was periodically to vacation at the property with his family, and David Smith never controlled the asset in any way. Thus, on this record, there exists no likelihood of success that the SEC will demonstrate that David Smith was a joint, equitable, or beneficial owner of the property. Therefore, the SEC's motion as to the Great Sacandaga Lake camp is denied and the asset freeze in the TRO as to the camp is vacated.

### 3. The Trust

The SEC contends that the Trust is an appropriate relief defendant and, that in the alternative, even if it is not properly named as a relief defendant, David Smith was a beneficial owner of the trust over which he asserted dominion and control. The Trust contends that it cannot be pierced under the alter ego theory and that David Smith is not the equitable owner of the Trust.

### a. Relief Defendant

■ The SEC has failed to demonstrate a likelihood that it will prove that the Trust is an appropriate relief defendant. First, the SEC has not established that the Trust was created with ill-gotten gains. It is undisputed that the Trust originated from bank stock in the Stock Account purchased in the early 1990s well prior to 2003 when the SEC alleges the scheme began here. T. 349. In fact, none of the named entities except MS & Co. existed at that time. T. 363. Thus, there is no proof that fraudulently obtained funds were deposited into the Stock Account prior to the purchase of the bank stock in the early 1990s.

This stock was untouched for the fourteen years it remained in the Stock Account while it grew in value from $400,000 to over $4 million by market forces alone. No testimony or proof was offered that additional capital was invested into the

stock or that the portfolio was otherwise modified since the 1990s. Accordingly, this stock investment represents untainted funds easily identifiable and severable from the stock account as a whole. *See Heden,* 51 F.Supp.2d at 302 & n. 4 (explaining that it is inappropriate to freeze assets initially used to purchase legitimate investments, regardless of the authenticity of the later transfers with the stock, but, the subsequently earned proceeds of the stock, if fraudulently obtained, may represent ill-gotten gains); *Better Life Club,* 995 F.Supp. at 182–83 (finding mortgage payments and trade-in credit untainted and provable funds that were probably reimbursable since they were not ill-gotten). As such, the *Cavanagh* factors cannot be fulfilled because the Trust was neither created from nor in possession of ill-gotten funds.

Second, there is no evidence that the purchase or sale of the bank stock was fraudulent or otherwise illegal. By all accounts, the stock was purchased for value. Thus, appropriate consideration was provided for the purchase and the Smiths had a legitimate interest in the eventual growth, sale, and proceeds of the bank stock at a time predating the commencement of the scheme alleged herein. *See, e.g., Cavanagh,* 155 F.3d at 137 (explaining that a legitimate interest in funds arises when relief defendants can demonstrate that they gave consideration in the exchange). Therefore, the SEC has failed to demonstrate a likelihood of success on this ground that the Trust is an appropriate relief defendant as the SEC has failed to prove that the Trust received or was created with ill-gotten gains or that it had no legitimate claim to its corpus.

#### b. Equitable or Joint Ownership

■ The SEC has also failed to demonstrate that David Smith was an equitable owner in the Trust Account. The record is devoid of any proof that David Smith "exercise[d] considerable authority over [the trust] to the point of completely disregarding [its] form and acting as though its assets [were] his alone to manage and distribute ..." *In re Vebeliunas,* 332 F.3d at 92. David Smith acted as the broker for the Trust. *See* T. 556 (explaining that the current trustee believes that a prudent trustee would hire an investment advisor to preserve, protect, and grow the corpus of the trust). The original trustee, Urbelus, possessed the authority to utilize a broker to assist him in his duty to preserve the Trust corpus. As trustee, Urbelus retained the final authority for approving distributions and authorizations. T. 418. While David Smith advised him on the appropriate assets to buy and sell, Urbelus provided the final consent and signed the appropriate authorizations. T. 418. Unlike the Stock Account, there were no pre-signed forms from Urbelus that David Smith could use at any time. T. 216. Each suggested transaction was discussed, a form was sent from David Smith to Urbelus, Urbelus signed the form, and the requested action was taken soon thereafter. Therefore, David Smith did not exercise authority over the Trust but acted as an advisor and broker. Urbelus was indisputably the one who maintained control of the assets.

Furthermore, David Smith did not distribute the assets to himself and the record does not support the conclusion that David Smith considered the Trust his own property. On occasion, David and Lynn Smith provided their children with financial support, presumably including when they paid the Trust's taxes, for the stated benefit of conserving the trust corpus and assisting their children. T. 135–37, 145–49, 187–88, 399. Such tax payments from David Smith for the Trust and, by extension, his children are insufficient to estab-

lish equitable ownership. *In re Vebeliu-nas*, 332 F.3d at 93 (refusing to pierce a trust based on equitable ownership even though the husband paid all expenses of the trust because "spouses routinely administer each other's assets and conduct business on behalf of each other.").

David Smith received money from the Trust on one occasion which was unrelated to the payment of the Trust's taxes. However, that distribution was requested and authorized by his son, Jeffrey, a beneficiary of the trust T. 398, 513–16. Because the Trust had virtually no limits on the types of distributions the beneficiaries could request, the money was properly requested and provided. T. 534–35, 560. Once Jeffrey Smith's request was approved by the trustee, he was free to use it as he saw fit, including sharing it with his parents. T. 398, 560. He used the money to help his parents meet their tax obligations. This action is insufficient to establish control and ownership by David Smith. Moreover, this single use of the Trust for the benefit of David Smith differs materially from the pattern of such use of the Stock Account over a period of years. Furthermore, even though a benefit was temporarily conferred, this assistance was still insufficient to act as total reimbursement for all of the financial help David and Lynn provided to the Trust for the prior payments of the Trust's taxes. No other distributions were requested or provided to David Smith. Thus, the Trust's benefits did not flow to David Smith and he did not exercise control over them such that he treated the corpus as his own.

Accordingly, there is no likelihood that the SEC will prove that David Smith was the beneficial owner of the Trust. Therefore, the SEC's motion as to the Trust is denied and the Trust's motion to vacate the asset freeze in the TRO as to the Trust

is granted. While the Trust also seeks an award of attorney's fees and costs incurred in connection with this proceeding, it has offered no authority for such an award. Finding that the SEC acted to freeze the Trust in good faith and with sufficient cause, the Trust's motion for an award of attorney's fees and costs is denied.

### 4. McGinn Residence

In 2009, McGinn transferred title to his residence in Niskayuna, New York from a title held jointly by he and his wife, Nancy McGinn, into his wife's name alone. T. 302. The stated consideration was $1 and the transaction occurred after commencement of the FINRA proceedings, complaints from investors, and as David Smith was transferring various properties held jointly with his wife into her name alone. T. 301–02. The SEC contends that McGinn's residence remains subject to the TRO asset freeze and is included within McGinn's consent to the preliminary injunction at issue here. Pl. Mem. of Law (Dkt. No. 47) at 16–17. McGinn contends that because title to the residence is now held solely by Nancy McGinn and because she has not been named as a defendant or relief defendant, the residence was not included in the TRO asset freeze nor in the preliminary injunction to which he consented. Dkt. No. 71.

There exists no dispute that the residence is now held solely in Nancy McGinn's name. Therefore, while the SEC would appear to have demonstrated sufficient cause to include the residence in the asset freeze as with the Smiths' assets transferred into Lynn Smith's name alone, Nancy McGinn is not a party to this action in any capacity. Unless and until she is, this Court lacks jurisdiction to restrain her actions with respect to any property presently titled to her alone. *See NASCO, Inc. v. Calcasieu Television & Radio, Inc.*, 124 F.R.D. 120, 134–35 (W.D.La.1989) (holding

that court lacked jurisdiction to restrain property allegedly involved in fraudulent transfer until question of title holder had been resolved). Accordingly, the Niskayuna residence now titled to Nancy McGinn alone is not included within the TRO asset freeze nor within the preliminary injunction to which McGinn has consented.

### III. Conclusion

For the reasons stated above, it is hereby

**ORDERED** that:

1. The SEC's motion for a preliminary injunction continuing the asset freeze as to the defendants and Lynn Smith (Dkt. No. 4) is:

A. **GRANTED** as to all defendants;

B. **GRANTED** as to Lynn Smith for the Stock Account, Vero Beach home and her checking account;

C. **DENIED** as to Lynn Smith for the Great Sacandaga Lake camp as to which the asset freeze is **VACATED**; and

D. **DENIED** as to the Trust as to which the asset freeze is **VACATED**; and

2. The Trust's motion to lift the TRO as to the Trust and for attorney's fees and costs (Dkt. No. 31) is:

A. **GRANTED** as to the TRO and the TRO is **VACATED** as to the Trust; and

B. **DENIED** as to attorneys fees and costs.

**IT IS SO ORDERED.**